### TIBBE et al v. KAMP et al., Appellants.

#### In Banc, March 3, 1900.

1. **Undue Influence: MEANING.** The settled meaning of undue influence in this State is such influence "as amounts to over-persuasion, coercion, or force destroying the will-power of the testator. It is not merely the influence of affection, nor the desire of gratifying the wishes of one beloved or trusted by the testator."

2. ———: **EXISTENCE AND EXERCISE: WILL CONTEST.** In a proceeding to set aside a will as being the result of undue influence, the undue influence must not only exist, but it must be shown by affirmative proof to have been actually exercised at the time the will was executed.

VOL. 154 mo—35

Tibbe v. Kamp.

3. ———: ———: BURDEN OF PROOF: EXCEPTION.  Ordinarily the burden of such showing is on the party asserting it, an exception being the existence of confidential relations between the testator and the legatee to whom is bequeathed substantially all the property.

Held, by VALLIANT, J., dissenting, that under the circumstances of this case, the burden was on the proponents of the will.

4. ———: ———: MATTER FOR JURY: WILL CONTEST.  Where there is any substantial evidence upon which a verdict setting aside a will, as being the result of undue influence, can rest, the case is one for the jury; otherwise, for the court.  And under the facts in evidence in this case there was no substantial basis for the verdict, and hence the judgment is reversed.

Held, by VALLIANT, J., dissenting, that there is a substantial basis for the verdict, and that, if it is not affirmed, the case should be remanded for a new trial.

5. ———: WILL CONTEST: RELIGIOUS INFLUENCE.  It is held that the facts in this case afford neither a basis for a reasonable and fair inference, nor a suspicion that the will was the result of the undue influence by a minister upon the testator, a parishioner of his church, and an old, ignorant man, who had through the kindness and intelligence of his son become wealthy in his old age.  (VALLIANT, J., dissenting.)

Appeal from Franklin Circuit Court.—*Hon. Rudolph Hirzel,* Judge.

REVERSED AND REMANDED *(with directions.)*

*A. H. Bolte, Jesse H. Schaper, James Booth* and *Lubke & Muench* for appellants.

(1)  The trial court committed error in admitting over defendants' objections, immaterial, incompetent and hearsay testimony of the declarations made by testator long before and after the date of the will, to the prejudice of defendants. These declarations of testator, introduced in evidence by plaintiffs, were all remote from the time of execution of the will in contest and did not have any connection with it.  The rule is well settled in this State since the leading case of Gibson v. Gibson, 24 Mo. 227, that on the issue whether or not a will was procured by undue influence, declarations of

the testator made before and after its execution, are not admissible as evidence of the truth of the facts mentioned in such declarations; but that such declarations are only admissible when the condition of the testator's mind is the point of contention or it becomes material to show the state of his affections. And they are then received as external manifestations of his mental condition, provided always that such declarations have some direct connection with the will in point of time. Bush v. Bush. 87 Mo. 518; Walton v. Kendrick, 122 Mo. 518; Doherty v. Gilmore, 136 Mo. 421. Declarations of testator subsequent to the making of a will are not admissible. Gordon v. Burris, 141 Mo. 613. (2) The trial court committed error in admitting, over defendant's objections, the testimony shown in the foregoing abstract giving a detailed history of the life work of plaintiff, Arnold Anton Tibbe, embracing a period of about twenty-five years, from 1870 to 1896, his work and wages as a boy, his conduct and personal character, his contracts, his entrance into the business of the manufacture and sale of cob pipes, his efforts in enlarging and developing the pipe industry and the business management thereof, his misfortunes in other business enterprises, his constructing and operating an electric light plant in 1892 and subsequent thereto, together with his many statements and opinions. All this testimony was irrelevant, and incompetent and tended to confuse and prejudice the jurors and to lead them to believe it their province to say whether the testator made a wise will or treated his son justly or acted unreasonably in his charities and to render a verdict against the will on one or more of these grounds. Couch v. Gentry, 113 Mo. 256; Defoe v. Defoe, 144 Mo. 461; 1 Greenl. on Evid., sections 51, 52. (3) There was no evidence of undue influence in this case to warrant the trial court in submitting that issue to the jury; and therefore the trial court erred in so doing. 1 Redfield on Wills (3 Ed.), sec. 38, pars. 38, 47; Jackson v. Hardin, 83 Mo. 185; McFadin

v. Catron, 138 Mo. 218; Riley v. Sherwood, 144 Mo. 366; Aylward v. Briggs, 145 Mo. 604; 1 Woerner's Am. Law of Admin., p. 47; Sunderland v. Hood, 84 Mo. 293; Cash v. Lust, 142 Mo. 630; Bose v. Rossborough, 6 H. of L. Cases, 2; Carl v. Gabel, 120 Mo. 283; Gordon v. Burris, 141 Mo. 614; Fullbright v. Perry Co., 145 Mo. 442; Maddox v. Maddox, 114 Mo. 35; Berebet v. Berebet, 131 Mo. 410; Doherty v. Gilmore, 136 Mo. 420; Farmer v. Farmer, 129 Mo. 539.    (4) · Undue influence to vitiate a will must result in a devise or bequest in favor of the party charged with exercising it.    In the case at bar there is no devise or bequest in favor of Frederick Holke who is charged in the petition with having exercised such undue influence over Henry Tibbe, deceased.    Jarman on Wills (2 Am. Ed.), ch. 3, par. 36; Woerner on Admin., sec. 32; Hegney v. Head, 126 Mo. 629. (a)    Proof of the existence of an undue influence, but not exercised, upon the mind of the testator when he makes a will, is not sufficient to invalidate it.    And proof that there was opportunity for exercising the influence is also insufficient. Sunderland v. Hood, 84 Mo. 293; Brinkman v. Rueggesick, 71 Mo. 556; McFadin v. Catron, 120 Mo. 275; s. c., 138 Mo. 219.    (b)    The burden of proof to establish undue influence is upon the party alleging it.    Gordon v. Burris, 141 Mo. 614; Doherty v. Gilmore, 136 Mo. 419; Berebet v. Berebet, 131 Mo. 399; McFadin v. Catron, 120 Mo. 252; Carl v. Gabel, 120 Mo. 295; Maddox v. Maddox, 114 Mo. 35; Jackson v. Hardin, 83 Mo. 175.    (5)    The tests are mental capacity and free agency; and when these exist the testator has the right to make an unreasonable, unjust, injudicious will, and his neighbors have no right, sitting as a jury, to alter the disposition of his property, simply because they may think the testator did not do justice to his family connections.    Maddox v. Maddox, 114 Mo. 47; Boylan v. Meeker, 15 N. J. Eq. 310; Mackall v. Mackall, 135 U. S. 171; Smith v. Smith, 48 N. J. Eq. 591; Jackson v. Hardin.

83 Mo. 185; Defoe v. Defoe, 144 Mo. 461; Farmer v. Farmer, 129 Mo. 539.

*J. W. Booth* and *J. C. Kiskaddon* for respondents.

(1)   In a contest of a will, the burden is on the proponents to show, that the decedent, with a knowledge of its contents, and with sufficient mental capacity to understand the business in which he was engaged, and comprehend, at least, in a general way, the amount of his property. and be able to bear in mind the natural objects of his bounty, executed the alleged will.    Norton v. Paxson, 110 Mo. 456; Carl v. Gabel, 120 Mo. 283; Maddox v. Maddox, 114 Mo. 35; Benoist v. Marrin, 58 Mo. 307.    (2)   When the testator is illiterate, it must be also shown that he was acquainted with the contents of the will, before he signed it, for in such case the presumption that one who executes an instrument knows and approves its contents, does not arise.    29 Am. and Eng. Ency. of Law (1 Ed.), 176.    By parity of reasoning, where the will is in a language, which the testator does not read, write or speak, it must be shown that before he signed it, it was properly interpreted to him.    (3)   The relation of pastor and parishioner is a confidential relation of the same nature as the relation between attorney and client, physician and patient, guardian and ward, etc.    When such confidential relation exists and the pastor writes, dictates or procures to be written or executed or actively participates in procuring to be executed, a will favorable to himself or to some outside party or object, the law raises the presumption that the will was procured by the undue influence of the pastor and imposes on the proponents of the will the burden of proving that it was the free and spontaneous act of the testator.    Garvin v. Williams, 44 Mo. 465; s. c., 50 Mo. 206; Muller v. St. Louis Hospital Ass'n, 5 Mo. App. 390; s. c., 73 Mo. 242; Caspari v. First German Church, 12 Mo. App. 293; s. c., 82 Mo. 649;

Bridwell v. Swank, 84 Mo. 455; Hegney v. Head, 126 Mo. 619; 27 Am. and Eng. Ency. of Law (1 Ed.), 508 to 516. (4)   In such a case circumstances of secrecy in the execution of the will, or in the concealment of the existence of the will, actively participated in by the pastor, greatly strengthen the presumption of undue influence.   27 Am. and Eng. Ency. of Law (1 Ed.), 507, 508.   (5)   All the foregoing grounds of presumption are greatly strengthened, where the testator acted without independent advice, and was of advanced age, lacking in ordinary business capacity, very pious, and of a simple and trusting nature.   Armstrong v. Logan, 115 Mo. 465.

### IN DIVISION ONE.

MARSHALL, J.—This is a proceeding by the son and widow to contest the will of Henry Tibbe, on the grounds: 1st, that it was not his will and that he was not of sound and disposing mind when he executed it; and 2d, that it was procured by the undue influence of Reverend Holke, the pastor of the Evangelical St. Peter's Congregation, of which the deceased was a member.   The trial in the circuit court resulted in a verdict and judgment in favor of the contestants, setting aside the will, on the second ground alleged, the first ground having been withdrawn from the jury by an instruction, and the defendants appealed to this court.

We will let the plaintiffs, the winning party below, tell the story of the trial.   It is as follows:

"Henry Tibbe died at the county of Franklin, October 20, 1896, leaving surviving him his son and only heir, Arnold Anton Tibbe, and his widow, Johanna Tibbe, and leaving an estate of the value of about $63,000.

"On the 26th of October, 1896, an instrument purporting to be the last will of said deceased, was by the probate court of said county admitted to probate.   By said instrument

the entire estate of Henry Tibbe was divided in halves.    Out of one-half $500 was given to the testator's stepdaughter, Margaretha Den Hoed, called in the will 'Margaretha Hoed.' The balance of that half was given to said widow for her life, with remainder to said Anton, with remainder over to the 'Board of Directors of the Evangelical Seminary in St. Louis county, Missouri, their successors and assigns for the use of said corporation', in the event of Anton dying without leaving issue of his body.    Of the other half of the estate, the will gave to the trustees of 'The Evangelical St. Peter's Congregation, of Washington, Mo.,' the sum of $1,500 to be paid within six months after the testator's death, to be used exclusively for the purpose of building a new parsonage for said church; subject to a condition that if not so used within two years after the testator's death, the same should go to and forever belong to said board of directors, etc., for the use of said corporation.    The rest of that half of the estate said instrument gave in equal shares to said board of directors, etc., for the use of said corporation, and to the 'Deutsche Evangelische Synode of Nord Amerika,' a corporation incorporated under the laws of the state of Indiana, their successors and assigns, to be held and used by said corporation exclusively for the benefit of the mission board of said Synode.

"The 8th section of said instrument was as follows:    'I hereby appoint as executor of this my last will and testament Heinrich Hermann Kamp, of Washington, Missouri, and in case of his death, inability or refusal to act, I appoint Frederick Wilhelm Stumpe, of Washington, Missouri, and direct that my executor shall not be required to give bond as such.'

"Said instrument bore date 'the 29th day of November, 1890.'

"November 11th, 1896, this contest was begun in the circuit court of said county.

"Contestants are the widow and son of the decedent.    All

persons and corporations interested in the contested instrument are made defendants.

"The contestants allege:

"First. Generally, that said instrument is not the will of said decedent.

"Second. That when Henry Tibbe executed said instrument he was not of sound and disposing mind and memory.

"Third. That at the time of the execution of said instrument and for a long time theretofore, one Rev. Fr. Holke, was pastor and religious adviser of said Henry Tibbe, and as such, possessed and enjoyed the trust and confidence of said Tibbe; that wrongfully taking advantage of the trust and confidence reposed in him by said Tibbe as his pastor and religious adviser, and secretly, without the knowledge of said Tibbe's family, and without said Tibbe having any independent, disinterested advice with respect to the disposition of his property, said Holke procured said Tibbe to execute said instrument at a time when said Tibbe was old, and mentally and physically infirm, and that so said Tibbe was by undue influence induced and led to execute said instrument.

"Defendants deny said allegations of confidential relations and undue influence, and allege that said instrument is the last will of Henry Tibbe, deceased.

"The trial resulted in a verdict and judgment that said instrument is not the will of said Henry Tibbe, deceased, and from that judgment this appeal is prosecuted.

"Henry Tibbe was born in Holland, May 21, 1819. His father and mother died when he was ten or twelve years old. He was one of the oldest of their children and had to support himself and brothers and sisters. His education was very limited, because, during the days, he had to work in the woolen mills; hence, could only attend night schools. He married Johanna Moolenberg August 19, 1853. She was then a widow with one child named Margaretha Den Hoed. They had but one child, a son named Arnold Anton, who

was born in Holland, December 31, 1858. The entire family came to the United States and settled at South Point, in Franklin county, Missouri, in January, 1866.

"When Henry Tibbe came to the United States he was a very poor man, by trade a wood turner. For about three years he lived at South Point, and then moved to Washington; from that time until his death, which occurred October 20, 1896, he resided at Washington.

"In 1873, the son, Anton, was apprenticed to George Bergner, for a term of about four years to learn the gunsmith trade. He served out the apprenticeship. He got wages from Bergner which he took home to his father.

"About 1872, Henry Tibbe began turning pipes and gradually increased his business in a small way. When Anton's apprenticeship was over he began working with his father. Shortly after this Anton went to St. Louis to try to sell some of the pipes, and got an order for 6,000 of them, which they made and shipped.

"About this time Anton suggested to his father that they ought to patent the pipes. The old gentleman said he was too poor, and didnt' have the money. Anton said, 'I will go to Mr. Bergner and get the money.' His father said, 'All right,' and Anton went to Bergner and got the money, and through Munn & Co., in July, 1878, in the name of his father got a patent on the pipes. Up to that time only hand power had been used in turning pipes.

"Anton proposed to his father to buy an engine for that purpose. His father replied that he didn't have the money to do anything like that, and that they might break up with it. Anton applied to Mr. Hibbeler for a loan of $230 with which to buy an engine, and arranged with him to rent a building for a factory. Hibbeler gave him a check for $230, and Anton reported to his father what he had done. The father thought the son was going to fast, and Anton asked him if he would complain if he got somebody to go in partnership

with him and start the factory. The old gentleman said 'No,' provided they didn't sell the pipes to the parties he and Anton were then selling pipes to. Anton told him he would take all the pipes that he would make off his hands at the price he was selling them for. To this the father agreed.

"A few days afterward Anton suggested to his father that they two could run the business; that there was no need of taking a partner, and proposed that they try it, to which the father consented.

"Hibbeler first rented the house to Anton for $12.50 a month. His father, after he concluded to go into business with Anton without a partner, went to Hibbeler and asked if he couldn't live upstairs, and Hibbeler agreed with him to have it fixed up convenient for him to live there and to lease the whole place to him for $15 a month, and they moved there.

"The engine came on Good Friday of 1878, and shortly thereafter they got their machinery up and began making pipes at that place.

"Anton then sold all pipes direct from the factory. Shortly after they began business at the Hibbeler house, one Lange Heinecke, a countryman of Henry Tibbe, with whom he had no previous acquaintance, came along and secured from the Tibbes a contract with them to sell pipes on a commission of twenty-five per cent. Shortly thereafter Heinecke came back and suggested that he could make more money if the Tibbes would sell state and county rights, and secured from them, with a view to such sales, a power of attorney. After this a controversy occurred as to pipes Heinecke had sold to parties who failed to pay for them, and Heinecke wrote to the Tibbes that unless he could hold them to the twenty-five per cent commission contract he would get even with them by selling the patent for the whole United States, and shortly thereafter made a sale of the patent. This resulted in litigation, about the patent, which lasted two or three years.

During this litigation, in the fall of 1879, Anton told his father that with this litigation and all the trouble, that he (Anton) could not carry on the business, and suggested that they take in a partner.

"Pursuant to this suggestion a one-third interest in the business was sold to George H. Kahman for $500, and he came in as a partner. Up to that time the pipe business had been conducted under the name of H. Tibbe & Son. Upon Mr. Kahman's coming in it was changed to H. Tibbe, Son & Co.

"About three years after Kahman came in as a partner Kahman and Anton Tibbe concluded that the premises they occupied and the machinery they had there, were inadequate to meet the requirements of the business, and proposed to build a new factory and put in new machinery. Henry Tibbe objected; thought the younger men were going to fast. They made an agreement with him by which they were to build a new factory and put in necessary additional machinery at their own expense, and to pay him .$200 a month royalty. This they did.

"In 1886, U. L. Weirick, of Kansas City, bought of Anton Tibbe and George Kahman a third interest in the business under the arrangement between the latter two and Henry Tibbe last mentioned. Anton Tibbe, Kahman and Weirick continued to carry on the business, paying Henry Tibbe said royalty up to 1887, when they with Henry Tibbe agreed to incorporate the concern with a capital stock of $60,000, divided into 300 shares of $200 each; Kahman, Weirick and Anton Tibbe to have each eighty shares and Henry Tibbe sixty. The difference between the number of shares alloted to Henry Tibbe, and the other incorporators was on account of the fact that Kahman and Anton Tibbe, through whom Weirick derived his interest, had invested about $10,000 in the new factory and machinery. When the agreement between the parties had been made orally on this basis, Kahman,

Weirick and Anton Tibbe went to Kansas City and had the incorporation papers drawn there by Mr. Weirick's attorney. When the papers were being drawn and it came to the division of the stock Anton told the attorney that he wanted his father put on the same footing with Mr. Weirick and Mr. Kahman, and that he (Anton) would take the stock which it had been agreed his father should have; and so the corporation was formed a basis of eighty shares to Weirick, Kahman and Henry Tibbe, and sixty shares to Anton Tibbe.

"Anton was general manager of the factory from the time it started until about one year after the incorporation, then he and George Kahman ceased giving their personal attention to the business, and turned it over to Mr. Weirick and Guy Kahman. Guy Kahman had then acquired five shares of the stock from his brother George.

"The capacity of the first factory was from 500 to 1,000 pipes a day. At that time they had no improved machinery at all. When Anton Tibbe and George Kahman turned the factory over to Weirick and Guy Kahman to conduct, it was fitted with the most improved machinery and its capacity was about 15,000 pipes a day. The improved machinery was not for turning pipes but for other parts of the work, and had been devised by Anton.

"The corporation conducted the business continuously to the present time. Ever since the incorporation the stock has been paying about 20 per cent annual dividend.

"In August. 1896, Geo. Kahman sold Henry Tibbe thirty-three of his shares of the corporation stock.

"From the time Geo. Kahman went into partnership with Henry and Anton Tibbe, Henry Tibbe looked after the turning of pipes, and examined cobs brought in by farmers for sale for about a year, then Anton became superintendent of the factory. From that time until about 1892 Henry Tibbe worked in the factory like other laborers, taking no part in the management of the business. After 1892 he

worked off and on in the factory as other laborers as suited his convenience, taking no part in the conduct of the business. During the time he received a royalty he got no pay for his work. After that he was paid by the piece according to what he did.

"He left the litigation affecting his patent to the management of his son Anton and George Kahman, and they after some three years litigation, compromised it.

"Geo. Kahman, Guy Kahman and Weirick, who with Anton Tibbe, carried on the pipe manufacturing business from the time the first partnership was formed, and who, by their associations with Henry Tibbe were best fitted to judge of his business ability, agree that he had no business capacity whatever, and that he was of a simple, honest and confiding nature, easily influenced by any person whom he trusted, and that his confidence was easily gained. According to the testimony of the two Kahmans and of Weirick, Henry Tibbe left the management of his interests in the factory absolutely to his son Anton. He rarely attended corporate meetings, and when he did attend took no part. When consulted as to matters under consideration at such meetings, his reply would be, 'Whatever Anton says is all right.' Anton habitually voted his stock in his presence and in his absence.

"In the year 1887 at the instance of Anton, Henry Tibbe put his valuable papers in the keeping of Guy Kahman, then secretary of the corporation. Kahman kept them for him until about July 25, 1890, and then suggested to him that it would be better to keep them at the bank. Thereupon he took them to the bank and turned them over to F. W. Stumpe, cashier, who kept them until his death. While Kahman kept his papers the checks for Henry Tibbe's share of the profits of the business were generally made out payable to Anton. Henry Tibbe was getting more money than he was accustomed to. He asked Guy Kahman what he should do with the checks. Guy Kahman told him to buy bonds, and

he did so, getting Mr. Stumpe to buy bonds for him.   Mr.
Stumpe testifies that Henry Tibbe brought him all his securi-
ties, deeds, bonds and notes and asked him to take care of them
for him in the bank vault; that he would calculate his interest
for him and clip off his coupons and place them to his credit,
and when Henry Tibbe had any money he would at times ask
him to invest it, and he did so; that this continued from 1890
up to his death.   That Mr. Tibbe was an old gentleman
without any education, couldn't figure interest and didn't
know a bond or a coupon, and could barely write his own
name.   He couldn't make out a check himself; that he
(Stumpe) usually transacted all Mr. Tibbe's business, and
laid the check down to him and showed him where to sign it.
And this testimony is corroborated by all the other evidence
in the cause.

"Henry Tibbe's command of language was very poor.
He could not speak or write High German, Low German or
English.   He spoke a mongrel language, High German, Low
German, English and Holland badly mixed, so that it was
extremely difficult to communicate with him except in the
most limited manner in any other language than Holland,
that is to say, pure Dutch, a language not spoken by any
witness in this case, unless it be Anton Tibbe.

"Henry Tibbe was always on the most affectionate terms
with his wife and son.   His affection for and his confidence
in his son are proved beyond controversy, by the evidence
in this case.   In addition to the evidence hereinbefore recited.
Mr. Hake, Mr. Suttrop, Mr. Hibbeler, Mr. Jones, Mr. Hoff-
man, Mr. Nortman, Mr. Pike, Mr. Stumpe and Dr. Butler,
all bear witness to the fact.   We do not deem it necessary to
repeat their evidence in detail.

"Rev. Fr. Holke located in Washington as pastor of an
Evangelical Lutheran Congregation, known as the Evangeli-
cal St. Peters Congregation, about September, 1887, and re-
mained there as such pastor for about nine years.   St. Peters

Congregation belongs to the jurisdiction of the Deutsche Evangelical Synode of Nord Amerika, which is incorporated in the state of Indiana, and is synonymous with the German Evangelical Lutheran Church. The Evangelical Seminary, defendant in this case, located in St. Louis county, Missouri, is an institution of that church, and under its jurisdiction, and is maintained for the education of ministers of that church. Henry Tibbe belonged to said St. Peters Congregation about twenty-five years before his death. From the time that Holke took charge of that church as pastor he held services every Sunday forenoon and sometimes in the afternoon, and Henry Tibbe was a regular attendant. Holke also made pastoral visits to members of his congregation, among others to Henry Tibbe. Several times a year he preached charitable sermons at which he says some of the members would make their contributions after the delivery of the sermon, and some would come during the week and bring their money.

"He denies that he on his pastoral visits or privately talked of the charitable institutions of the church to Henry Tibbe. But independent of the gifts made by the will and of evidence relating to the manner of the execution of the will, Holke's own testimony shows that he acquired in a very high degree the confidence and affectionate regard of Henry Tibbe.

"On his cross-examination he reluctantly admits the making of pastoral visits to Henry Tibbe during the first two years he was at Washington. Says he thinks he made three or four, but don't recollect how many. As to the next year every effort to induce him to estimate the number of his visits failed. As to the number of his visits from September, 1890, to November 29, 1890, he answered, 'I can't tell you, I didn't put that down,' and the examination proceeded thus: 'Q. Did you make any? A. I don't know, sir. Q. Were you there as often as twice a week in that time? A. I don't know of that. Q. Were you there as often as three or four

times a week? A. I don't know that I have been there three or four times a week unless some one was sick. Q. Were any of them sick at the time this will was made? A. I don't believe, but I don't know.'

"Being then questioned as to the presents made to him by Henry Tibbe he admitted that Mr. Tibbe made to him a number of presents; that he sent meat up to him during severe winters; that he bought him a heating stove and sent him wood several times; that he gave him a couch or sofa; that he made presents of sums of money at different times; that he gave him smaller sums on his birthdays; that he gave him ten or twenty dollars in gold a number of years; that he sent him $50 by one of his trustees. It was impossible to get anything definite from Mr. Holke as to the dates when these presents were made. On this subject his examination runs as follows: 'Q. About what time did Mr. Tibbe begin making you presents? A. Well, I can't tell you; perhaps after I had been about three years in Washington; but I don't recollect. Q. When did he send you this $50 you spoke of his sending by one of your trustees? A. I can't give you the year, neither the date. Q. Was it spring or fall? A. I don't know, sir. Q. Didn't he send it to you by Mr. J. L. Hake? A. Yes, sir. Q. Was it not in the year 1890 he sent it to you? A. I don't know, sir. Q. Well, do you know it was not in that year? A. I can't tell you; I have no idea in what year it was. Q. Well, now, for quite a while it was an easy matter to get anything from Mr. Tibbe you wanted, was it not? A. I do not know that I ever tried to get anything at all as a present from him. Q. Is that the only answer you choose to make to the question? A. That is the only answer I can make just now.'

"In like manner under cross-examination Holke admitted getting money from Henry Tibbe for charitable institutions; that he once got from him $500 for missions, and professed an inability to remember what year that was; that he got from

him $500 for an institute for epileptic people, it being an institution of said church, but professed absolute ignorance when he got that money; denied that he called Henry Tibbe's attention to those objects of charity, and by way of attempting to explain how he came to make those donations put them on the ground that he had been reading about them in papers, and being further examined as to his knowledge of this fact disclosed that it was a mere conjecture on his part that Mr. Tibbe knew of those institutions from papers he had read.

"In this connection we also call attention to the testimony of the Rev. Mr. Leesmann who succeeded Mr. Holke as pastor of the St. Peter's Congregation at Washington in September, 1896. Mr. Leesmann testifies that at that time in a conversation between him and Mr. Holke at the parsonage, Holke told him that Mr. Tibbe had donated the bell for the church and in case Leesmann should have charge of his funeral that should be announced at the funeral, that Mr. Tibbe had also made a will and in it donated to the congregation $1,500 on condition that they should build a parsonage near the church within two years after his death, and also had willed some of his property to the Evangelical Synode of Nord Amerika, that everything about his will should be kept secret, and that Holke also then stated that 'there was a time when he had Mr. Tibbe so far that he was away from his money, but of late he has become close.'

"Numbers of witnesses in the case show that Holke was a frequent visitor at Henry Tibbe's house, and that the relation between him and Tibbe up to a short time before Holke left Washington was exceedingly friendly. Then a change occurred. Mr. Pike testifies that he had a conversation with Henry Tibbe about two weeks before Holke left Washington, in which he said to Mr. Tibbe, 'Mr. Tibbe, we'll soon lose our pastor, Holke;' Mr. Tibbe replied, 'Yes, I like that.' Mr. Pike asked 'Why?' and Tibbe answered, 'I don't like pastor Holke all the time in the house, and all the time he wanted

more money, mehr geld, mehr geld, mehr geld,'—that is the expression Tibbe used.    Mr. Mittendorf testifies that in September, 1896, he had a conversation with Henry Tibbe, in which Mr. Tibbe said to him, 'Our preacher is going away, ain't he?'    That Mittendorf answered, 'Yes.'    Then Tibbe said, 'What do you think, I gave Reverend Holke over $500, and he was here a couple of days ago and wanted some more.' And then after some further conversation Mr. Tibbe said, 'Now, my son, Anton, had all his children baptized by Holke, and he paid him well for that I am sure, and do you suppose he ever went into Anton's house?    If he would have went there it wouldn't have done him any harm.'

"In the examination into the execution of the will of November 29, 1890, it was disclosed that Henry Tibbe had executed three wills and the proper presentation of the evidence requires that it should be here stated with reference to each of said wills in its chronological order:

"The first will was executed in June, 1889; the second, December 4, 1889, and the third, November 29, 1890.    Each of these wills was executed in the study room of the Rev. Fr. Holke at the parsonage in Washington.    The first and second of them were written in said study room by the Rev. Albert Muecke, in the presence of Reverend Holke and Henry Tibbe only.

"Rev. Albert Muecke at the time said wills were written was a minister of the same church as Reverend Holke, and was stationed as pastor at a church near Union, Mo., known as Mantel's church.    He had no acquaintance with Henry Tibbe, except that he had preached to the St. Peters congregation and at the close of services was introduced and shook hands with him.    He did not know any member of Mr. Tibbe's family, and had never visited his home.    The only direct testimony in the case as to how said wills came to be written, and as to their contents, is the testimony of Holke and Muecke.

"Holke testifies that may be in the last part of April or the first part of May, 1889, the old man Henry Tibbe came to his house and asked him to write his will, and that he told him he would do it.    That, when the old man explained that he had been a poor man at times, didn't know where hardly to get his daily bread; that the Lord had blessed him wonderfully; now, he might say he was a wealthy man, so he wanted to give one-half of his whole property to missions and church institutions—I mean to be spent in church and mission business.    About one-half he would give to his wife, so that after the death of his wife it should come to his son Anton, but $3,000 should be given to this St. Peter's Congregation at Washington for a parsonage near the church; it was a shame that its congregation had its pastor living the way he lived, and $500 should be given to his step-daughter in Iowa.    Then I told Mr. Tibbe, 'If you want to make such a testament I will not write it; I will not even sign it; I wouldn't have anything to do with that testament.'  'Why not,' he said:  I said, 'If you make such a testament and write it, if you die I will have trouble with your son, Anton, and I don't want that.' He asked, 'Don't you think that is a good will?'  I answered, 'Mr. Tibbe, you make your own will, as it suits you, but I would advise you to be just to your son Anton; don't do anything you will feel sorry about later.'    Then he commenced complaining about his son Anton wasting too much money, and that he thought the more money his son would get the worse it would be for him.    He himself didn't get anything from his father, and if his son Anton would get about $50,000 that would be good.  I said, 'Mr. Tibbe, I am  sorry I can't write your testament.'   He said, 'Well, can you give me the name of some one that would do that?'   I answered, 'You ask Mr. Kiskaddon or Mr. Booth, or some gentleman that is able to do so; it will cost you a few dollars but you won't mind that.'  'No,' he said, 'but I want that kept secret; if my wife will find it out she can't keep a secret; and my son Anton

will find out, too, and he will get angry, and I don't want that.'
I repeated again, 'Mr. Tibbe, I am sorry I can't help you;
you go somewhere where you can have your will written as
you want.' Then later he asked me, 'Do you think that
Reverend Muecke would write my testament?' He asked me,
'You ask Reverend Muecke about that when he comes to your
house.' 'Well, I may do that if you want me.' 'Yes; do so.'
Several weeks later, I can't say how many, Rev. Muecke came
to my house visiting me. He didn't know anything about
what had been said between Mr. Tibbe and me. Then I told
him all about it; we were walking in the garden and I told him
all about it, and he answered, after thinking a few minutes,
'If Mr. Tibbe intends to have his will written that way, I
don't see why I should not write it,' and then the day was
fixed when he would come and write it. I think it was some
day the next week. I called on Mr. Tibbe and told him that
Mr. Muecke had been at my house and that he was willing
to write his will on that day in the afternoon at my house.'

"The Reverend Albert Muecke testified that Holke told
him that a man by the name of Tibbe came to him and told
him that he would like to have his testament written by
Holke, and Holke said he told Tibbe he wouldn't do it. As to
this on cross-examination, Muecke was asked, 'What did Holke
say to you about that? A. He said he wouldn't have any-
thing to do with this Mr. Henry Tibbe's testament, and he
wouldn't have trouble. Q. What did he say about why he
wouldn't have anything to do with it? A. He said, I am
pastor of his church, and it is not good that I write it. You
please. And he asked me to write it.'

"Muecke testifies that he and Holke agreed on a day
when the will should be written of which Holke notified
Tibbe. That on the day appointed Muecke went to Holke's
house, and Holke sent for Tibbe. That shortly afterwards
Tibbe came and said to him, 'I am glad to see you here,'
and then said to him, 'I am willing to have my testament

written,' and asked if Muecke would do it. Muecke told him he was there for that purpose. He then wrote the will. On his direct examination he testified that Tibbe told him the points as to how the will should be written; on his cross-examination he admitted that when Holke asked him to write the will he informed him how the property was to be disposed of. He nowhere attempts to give any conversation between himself and Mr. Tibbe as to how the property was to be disposed of, but when he leaves that subject he purports to give conversations. He says, 'After it was written, Mr. Tibbe asked, "Who shall be witnesses to the document?" and I didn't say anything, and then he said, "Can't you sign it?" Well, I said, "Please leave me out of this thing;" then I signed it.' The other witness who signed it was Mr. Buchmueller.

"At that time St. Peters congregation had a parochial school. Buchmueller was teacher of that school, and boarded at Holke's house. He was a member of the German Evangelical Lutheran church, to which Holke belonged. When the will had been written and signed by Tibbe and Muecke, Holke got up, went to the door of Buchmueller's room, knocked and called Buchmueller into the study room. Then, according to the testimony of Reverend Muecke, Tibbe said to Buchmueller, 'I have made my last will; will you be so kind and sign it.' Then Buchmueller signed it. On being recalled to the stand, Buchmueller testifies as follows: 'Q. I will ask you to state if on signing the will, what, if anything, you heard Mr. Tibbe say about the will? A. Mr. Tibbe told us that we should keep very quiet about it, and not say a word, so that his son Anton wouldn't find it out.'

"Muecke testifies that when he was writing the will Holke was sitting back of them and was reading a book; that Holke was the only other person besides him and Tibbe then in the room, and didn't say a word to the testament writing as long as he was at work; that after he finished writing the

will, Tibbe remained a quarter or half an hour, that he (Muecke) remained a few hours and then left; and that Tibbe never spoke to him about that will again. He (Muecke) had never written a will before; that he sought information as to how to write it from a lawyer at Union; that he wrote the will in German. There is no evidence that the will was ever read to Tibbe. Muecke testifies that he don't know who took possession of the will.

"On this subject and as leading to the second will we quote from Mr. Holke's testimony as follows: 'Q. (Referring to first will.) When was that will signed? A. Some part in June, 1889. Q. What became of that will? A. That will has been kept several months; I don't know where. Q. By whom? A. I can't tell you; perhaps it was at his house; I can't tell you; I don't know. Q. Did Mr. Tibbe take it after you got through at your house that day? A. I don't know. Q. When did you give us that will? A. I saw that will several months later in the fall—I don't know what month. Q. How did you come to see it then? A. The old man came to my house one afternoon complaining about his son Anton and his wife. Q. Now, just tell what was said about this will, if anything, at that time? A. Then he said he wanted to change his last will. I told him, "Mr. Tibbe, don't be in a hurry with that; keep cool." He said, "I want that changed; you tell Mr. Muecke to come again and write that will." I answered, "If you want me to do so, I may tell him when he comes again." Q. And did you tell Mr. Muecke? A. I did. Q. What was done after you told Mr. Muecke he wanted to change his will? A. The day was fixed again and they came and changed the will.'

"Muecke testified that he never saw the first will from the time it was signed until he was called to Washington by Mr. Holke to write the second will, in the very first days of December, 1889. At that time when he reached the parsonage he found the Reverend Holke there. Tibbe came in,

maybe in a half an hour or an hour.    Here we quote Muecke's testimony: 'Q.    When Tibbe came what did he say?    A. Well, he said he would make a little change in that last will what I made a few months ago, in the summer of the same year.    Q.    Did he tell you why he wanted to make a change? A.    No; he didn't tell that.    Q.    Did he tell you what change he wanted to make?    A.    Of course I wrote it down, but I can't remember, and I think he didn't tell me the reason why.'

"Muecke also testifies that when that will was written no one was present except himself, Holke and Tibbe; that Tibbe remained there a quarter or half hour; that he (Muecke) remained a few hours and was not present when that will was signed. Muecke disclaims having given the testator any advice with respect to either of those wills, and being pressed on this point says he didn't tell him whether anything was good or bad, and that he was there merely as the writer.

"The second will written by Muecke was executed in the study room of the parsonage on the 4th day of December, 1889.    The attesting witnesses were J. H. Dieckmann and Henry C. Hollman, and said attesting witnesses and Holke and Tibbe were the only persons present at its execution. Said Dieckmann and Hollman were then members of the church of which Holke was pastor, and had been for many years.    They were called as witnesses by Mr. Holke.    Pursuant to that call they went to Holke's house and there found Holke and Tibbe.    The second will was lying on the table, and at the request of Mr. Tibbe they in the presence of Tibbe and Holke signed it as witnesses, December 4, 1889.    Dieckmann testifies that when this second will was signed he heard something said about not saying anything about it to anybody; that Mr. Tibbe said that when Mr. Holke was in the room with them; that he didn't want to have it made public, or some expression of that kind, as he wanted to keep it secret.

"With reference to the first of said wills we quote from

Holke's testimony as follows: Direct examination—'Q. Is that will in existence now? A. No, sir. Q. It is destroyed? A. It is destroyed. Q. Are you satisfied? A. Yes, sir. Q. How was that destroyed? A. Put in the stove in my study room. Q. Who put it in? A. I did myself. Q. Why did you do that? A. The old man wanted it destroyed. Q. Was he there when you destroyed it? A. I don't know.'

"Dieckmann and Hollman agree that when they signed the will of December 4, 1889, they left it lying on the table in Holke's study, and knew nothing of it afterwards. This will was also written in German.

"When the will of December 4, 1889, was executed it was left with Holke, who forthwith sent it to St. Charles, Mo., to the Reverend Wobus, at that time treasurer of said Synode. Shortly before the 29th day of November, 1890, said Wobus returned to Holke by mail said will of December 4, 1889, together with a draft of a will (the same here contested), written in English, which said Wobus had procured a lawyer in St. Charles to draw up. Holke then arranged a meeting of Tibbe, Dieckmann and Hollman for November 29, 1890, and on that day they met in his study room, and Tibbe executed said English instrument as his will; and asked Dieckmann and Hollman to sign it as witnesses; which they did in the presence of Holke. Hollman testified that at that time, 'Mr. Tibbe said he didn't like either of us to say anything about it.' When the will of November 29, 1890, was executed, it with the will of December 4, 1889, was by Holke returned by mail to the Reverend Wobus at St. Charles, who kept them until his death, when they, with his other papers, went into the possession of the Reverend Walser, of St. Louis, his successor as treasurer of said Synode, who kept them until after the death of said Henry Tibbe.

"The proceedings attending the execution of said wills were conducted with such secrecy that even Buchmueller

knew nothing of the contents of the will he signed, and neither Dieckmann nor Hollman knew anything of the contents of the wills attested by them.   The will signed by Dieckmann and Hollman were presented to them for their signatures, folded so that they could see nothing save the blank places left for signatures to the wills; they did not know in what language either will signed by them was written.   In the last will their signatures were at the foot of a certificate that Henry Tibbe on the day of the date thereof in their presence signed as his last will, and they at his request signed the same as witnesses in his presence.   Even the contents of that certificate were not communicated to them.   They were kept so utterly in the dark that at the trial they were unable to identify the instruments which they had signed; and defendants were compelled to put Holke on the stand to make out even a *prima facie* case of formal execution of the will in controversy.

"The will of November 29, 1890, was written in the English language.   The evidence shows conclusively that Henry Tibbe could not read, write, or speak the English language.   There is no evidence except the testimony of Holke that said English instrument was ever translated to Henry Tibbe.   Holke testifies that he translated it to him; but his testimony on this point is badly mixed, and on the whole does not appear to amount to more than a statement that he read to him the German will of December 4, 1889, and told him that the English testament differed in form but was the same testament.   He tries to strengthen his testimony on this point by testifying that when Tibbe asked Dieckmann and Hollman to sign the English instrument as witnesses he said to them, 'This was his last will made by him, had been translated to his advice; and read to him in German by me; and he wished them to sign this document.'   Neither Dieckmann nor Hollman gives him the slightest support in this claim that Tibbe declared that the instrument had been trans-

lated to him.   Even if the German instrument had been read to Tibbe by Holke, it was written in the High German language which Tibbe neither wrote nor read, and of which when spoken he had only a very limited knowledge.

"The claim that Tibbe understood the provisions of the will resting thus on the testimony of Holke, close consideration of his testimony with a view to a judgment on its credibility is necessary.

"On being called to the stand, in the attempt to make out a *prima facie* case as to the formal execution of the will in controversy, at a time when Dieckmann and Hollman had exposed the fact that they had signed two wills, he studiously and artfully concealed all matters relating to the first will. The fact of the execution of the first will, was first disclosed in the testimony of Muecke.   Holke was afterwards again called to the stand, and an examination of his testimony then given, and of that which he gave when first on the stand, discloses the fact that when first on the stand in his endeavors to conceal the execution of the first will, he applied to the second will alleged occurrences which he afterwards referred to the first.   Also on his first examination he denied all knowledge of who sent the papers to Reverend Wobus.   We quote from his examination as follows:   'Q.   Where is that German document? (referring to the German will of December 4, 1889.)   A.   I haven't got it.   Q.   What did you do with it?   A.   That has been returned with those sent to St. Charles.   Q.   Returned with the will sent to St. Charles?   A. Yes, sir.   Q.   When was that done?   A.   I think right after it was signed.   Q.   Who did it?   A.   I did not, no. Q.   What was done with the will when it was signed?   A. I can't tell you.   Q.   Where did you see it last?   A.   In my house.   Q.   Who took it away from there?   A.   I do not know.   Q.   Didn't you send it away to St. Charles?   A.   I can not tell you.   Q.   Who made this German document that you read to him at that time—the one that you sent with

the will to St. Charles?  A.  Mr. Tibbe made that testament. Q.  That was a testament?  A.  That was the testament that has been translated into English.  Q.  And what was done with it when it was made?  A.  As far as I remember, this was sent to the Reverend Wobus.  Q.  Who sent it?  A. I can not tell you.  Q.  You don't know?  A.  No, I do not know, I do not remember.  Q.  Didn't you do it yourself?  A.  I don't remember.'

"Afterwards when called in rebuttal, he on direct examination, testifies on this subject as follows: 'Q  (Referring to the will of December 4, 1889.)  What was done with that will after it was signed?  A.  Mr. Tibbe wanted me to keep that will, and I told him, "Mr. Tibbe, I will not do that; I don't want your will in my house," and he asked me where shall I put it.  "You take it along," I said.  "Well, then, my wife will find it."  "Well, I don't want it; you send it to Union to the probate judge," I said.  "Well then they would find out," he answered.  Then he thought over it and said, "I believe the best thing would be ·I send it to the treasurer of the Synode, Reverend Wobus, at St. Charles." I said, "If you say so, do it."  "Will you send it there for me?" he said.  "Of course I will do that.  Put it in an envelope and sent it to Reverend Wobus." '

"When first examined as to how the will of November 29, 1890, came into his hands, Holke testified as follows: 'Q. How did this paper first come into your hands?  A.  I don't recollect—it must have been sent by mail, but I don't recollect.  Q.  It must have been sent to you by mail from where? A.  From St. Charles.'  But on his reappearance in rebuttal, being examined as to this same matter, he testified as follows: 'Q.  (Referring to German will of December 4, 1889.) When did you hear from that, from Mr. Tibbe after the will was executed?  A.  A few days, I can't say how much. Later the old man asked me, "Are you sure that that will is legal?"  Q.  A few days after the will was executed?  A.

Several days, I can't say how many—I'm not positive in this last.   Well, he said, "I want you to tell Mr. Wobus he should attend to it that that will is legal"—put it in a legal form: And I wrote and told Rev. Wobus what the old gentleman had said.   Rev. Wobus told me that he saw a lawyer about it.   Q.   When did you next see that will?   A.   I can't give the time, sir.   Q.   Do you remember the occasion when you saw it next?   A.   I saw that will next—it was sent to me in an envelope by the Reverend Wobus, accompanied with the translation in the English language." '

"The destroyed will was, according to the testimony of Holke, the same as the German will of December 4, 1889, except that he testified that the second will did, and the first did not, provide that if Anton should die without any issue of his body, the property to go to him on the death of his mother should be given to the trustees of the theological seminary.   As a matter of fact said second will did not contain such a provision.   It provided simply that in case Anton should die before his father and mother then that part of the property devised to testator's wife should go to said seminary. The provision giving the property to the seminary in the event of Anton's dying without heirs of his body first appears in the will of November 29, 1890, drawn by the lawyer at St. Charles, and which Holke testifies that he represented to Tibbe as being the same as the German will of December 4, 1889.

"Holke testifies that Henry Tibbe came to him to write the first will, and at that time complained about his son Anton 'wasting too much money,' and that he thought the more money his son would get, the worse it would be for him. He also testified that when Mr. Tibbe came to him to change the will, he commenced 'complaining about his son Anton and his wife.'

"Holke refers the desire for secrecy to Tibbe, and his explanation of it is that Tibbe was afraid his wife would find

it out; that she could not keep a secret; and his son Anton would find it out; and that would make him angry, and he didn't want that.

"Since Holke as to these matters testifies to what he claims transpired secretly between him and the testator, his evidence can only be met by proof of circumstances inconsistent with its truth.

"As against the claim that the father was moved to make the will by dissatisfaction with the son, on account of the son wasting money, the evidence is overwhelming that the father was very proud of his son, and reposed the highest confidence in him, was pleased with the son's enterprise and investments, and encouraged them. Moreover, there is nothing in the evidence on which to base the claim that the son was wasting any money whatever.

"As to the claim that the desire for secrecy originated with the testator, it is to be noticed that on the evidence it appears that Henry Tibbe himself was the only person who had any information with respect to the execution of the wills, who did not maintain strict secrecy with respect thereto. It is noticeable, also, that he is shown by the evidence to have mentioned the fact that he had made a will at his own home, to a lady friend, in the presence of his wife, in a manner utterly inconsistent with the idea that he was the controlling spirit in the effort to maintain secrecy.

"The evidence of Bertha Roehrig shows that in December, 1891, or January, 1892, Mr. Tibbe informed her that he had made a will, and the testimony of Mrs. Nortmann shows that during the summer of 1895 or 1896, he informed her in the presence of his wife that he had made a will, and the testimony of Mr. Baumann witness for defendants shows that in July, 1896, he told him he had made a will. In conversation with Bertha Roehrig and Mrs. Nortmann he not only told them that he had made a will, but told them that by his will he had given everything to his son Anton, providing

that Anton had to support his mother, giving her seventy-five dollars a month, which statements, in connection with the unvarying testimony as to his honesty and simplicity of character, amount to the most natural and direct proof that he was ignorant of the contents of the wills actually executed by him.

"There was no testimony tending to show that Henry Tibbe was insane; but there was testimony tending to show that he did not have sufficient mental capacity to realize what property he had, or to do business. Much of it is hereinbefore referred to. Holke testifies that when he proposed to him to divide his property in halves, out of one half to give $500 to Margaretha Hoed and to give the rest of that half to his wife for her life, and then to Anton, he said it would be good for Anton to have about $50,000. He lived nearly seven years after that; during which time under the management of others he was accumulating money rapidly; and at his death his entire estate only amounted to about $63,000. Counting in the stock which he had set apart as a birthday present for Anton it amounted to only $69,000. The will appointed Kamp executor, and provided that in case of death Wm. F. Stumpe (not the banker, who then had charge of all his business and papers) should be his executor, each without bond. The evidence shows that he was not particularly intimate with either Kamp or said Stumpe, and that he never spoke to them or either of them with reference to the will. The evidence further shows that Henry Tibbe had no independent or disinterested advice in the execution of any one of said wills, and that at the time of the execution of each one of them he was old and feeble minded. The word feeble-minded is not used by any witness, but the fact that such was his state of mind is shown beyond controversy by the evidence of his acts and proceedings."

At the request of the plaintiffs the court instructed the jury as follows:

Tibbe v. Kamp.

### PLAINTIFF'S INSTRUCTION.

1.   The court instructs the jury that the burden of proof in this cause is upon defendants, that is to say, the law does not require the plaintiffs to prove that Henry Tibbe did not make a will, but the defendants are required to establish by competent evidence to the satisfaction of the jury that the document read as being the last will and testament of said Henry Tibbe is in fact his last will and testament.

2.   Although the jury may believe that at the time Henry Tibbe executed the document propounded as his last will and testament he was capable of understanding that he was engaged in making a will, yet if the jury further believe that at that time he was not capable of comprehending the nature and extent of his property, or the persons or objects intended to be provided for by the will, or was then unable to dispose of his property with understanding and reason, then the jury will find that said document is not the last will and testament of the said Henry Tibbe.

3.   In determining whether the document here propounded as the last will and testament of Henry Tibbe, be in fact his last will or not, or whether the same was procured by undue influence, the jury should take into consideration the reasonableness or unreasonableness of the provisions of said document, and the evidence relating to the age, religious inclinations, education, mental condition and business qualifications of said Tibbe, the state of his affections towards the different members of his family, the degree of confidence he reposed in them or either of them, his declarations, if any, regarding the final disposition of his property, the circumstances under which the said document or any document of like nature was drafted and executed, the absence of independent disinterested advice in regard to the final disposition of his property, the relation of confidence, if any, existing between said Tibbe and Rev. Holke, and the part, if any, which

the said Holke took in procuring the execution of said docu-
ment, or of any document of like nature offered in evidence
in this case, the secrecy of the transaction relating to the final
disposition of the property of the said Tibbe, and all other
facts and circumstances detailed in evidence, and if from a
consideration of all the evidence the jury believe that the
execution of said document here propounded as said last will
was procured by undue influence, they will find said document
is not the last will and testament of the said Henry Tibbe.

4.   The court instructs the jury that the issues as to
whether or not the instrument propounded as the will of
Henry Tibbe was procured by undue influence, is to be de-
termined upon consideration of all the evidence in the case.
Positive testimony is not necessary to establish undue influ-
ence; and positive testimony denying undue influence is to be
considered and weighed with all the evidence of facts and
circumstances, but is not of itself to be taken as conclusive.
If upon the careful consideration of all the facts and circum-
stances proven in the case, you believe that undue influence,
as explained in these instructions, was used in obtaining the
will or causing the same to be executed, by said Tibbe, then
you should find that the same was so obtained, notwithstanding
such positive testimony.

5.   The court instructs the jury that if they believe from
the evidence that Henry Tibbe was a man of about seventy
years of age, of little education, strong religious feeling, of
confiding and generous disposition, and was well-to-do finan-
cially; that he had a wife near his own age with whom he
lived in Washington, Mo., that he also had a son of about
thirty-one years of age, who was married and lived near his
father in said town; that Henry Tibbe had no other child of
his body, but had a stepdaughter, the child of his wife, and was
a kind and affectionate husband and father; that one Holke
was the trusted pastor and religious adviser of said Henry
Tibbe; that said Henry Tibbe was a member of the religious

association known as St. Peter's Congregation at Washington, Mo., of which said Holke was the pastor, that said Holke had notice of the matters aforesaid and was well acquainted with said Henry Tibbe and with his wife and with his son, and lived in the same town with them, and frequently met them; that said Henry Tibbe under these circumstances went to said Holke and informed him that he wished him, the said Holke, to write the said Tibbe's will, and informed him that he, the said Henry Tibbe, desired to have such will made so as to dispose of the property of said Tibbe substantially as the instrument here propounded as the last will of said Henry Tibbe purports to dispose of said property; that thereupon said Holke informed said Tibbe that he would not write such a will for him; that afterwards, even though at the request of said Henry Tibbe, said Holke secured the consent of one Muecke, a minister of the same church of which said Holke was an ordained minister, to write said will; that said Holke informed said Muecke how the property of said Tibbe was to be disposed of and appointed a time and place for the said Muecke and said Tibbe to meet at the house of said Holke in Washington, Mo., to write and execute such will; that at the time and place so appointed, said Muecke and Tibbe met and in the presence of said Muecke, Holke and Tibbe, and of no others, the said Muecke drew a will for said Tibbe which purported to dispose of the property of said Tibbe substantially as said Muecke was informed by said Holke that the same was to be disposed of; that at the time and place, when and where such will was written, said Holke called in one Buchmueller, that said Buchmueller was a teacher in a parochial school connected with said religious association, and was a member of the same church of which said Holke was a minister, and was a boarder in the house of said Holke; that the said Buchmueller being called by said Holke came into the presence of said Holke, Muecke and Tibbe and thereupon the said Tibbe told him that the paper, referring to the will, prepared by said

VOL. 154 mo—37

Muecke, was his will, and that then and there said Tibbe signed said will, and at his request said Muecke and said Buchmueller attested the same by signing their names thereto as witnesses; that said Tibbe in the presence of said Holke, Muecke and Buchmueller, no other persons being present, said in substance that he wished the matter kept secret; that some time thereafter, pursuant to appointment made by said Holke, said Muecke and said Tibbe again met at the house of said Holke in Washington, Mo., and then and there said Muecke drew a second instrument to be executed by said Tibbe as his will, which instrument purports to make substantially the same disposition of the property of said Tibbe as the former will purported to make; that such second instrument was drawn in the presence of said Holke, Muecke and Tibbe, and of no other persons, and that said Holke called in two of his parishioners to sign the same as witnesses; and then and there said Tibbe signed said second instrument, and said parishioners signed the same as witnesses, and said Tibbe in the presence of said Holke, Muecke and of said witnesses, and of no other persons, again requested substantially that the matter be kept secret; that said second instrument being executed, the said, Holke sent the same to one Wobus treasurer of the synode, defendant herein, at St. Charles, Mo.; that shortly thereafter said Holke burned up the first instrument in his house; that on the 29th day of November, 1890, said Holke received by mail from said Wobus from St. Charles, Mo., the said second instrument together with the draft of the instrument here propounded as the last will of the said Tibbe, that on the said twenty-ninth day of November by appointment made by the said Holke, the two parishioners aforesaid and the said Tibbe again met at the house of said Holke, and said Holke inserted the date of said last mentioned instrument, and the same was then and there signed by the said Tibbe and attested by the said parishioners, no other person save said Holke, Tibbe and said witnesses being

present; that said last mentioned instrument upon being executed and attested was kept by said Holke and by him together with said second instrument returned to the said treasurer; that being so returned said last mentioned instrument was kept by said treasurer and his successors in office until after the death of said Tibbe, and said second instrument was kept by said treasurer and his successors in office until produced here on this trial by the successors of said treasurer; *then upon these facts above stated, if you believe them to be true, the law presumes that said Henry Tibbe disposed of his property in said last will by and through the undue influence of said Rev. Holke, and the burden of proof is upon defendant to show that said Tibbe executed said will voluntarily and of his own free will, without persuasion or undue influence on the part of said Holke.*

It is not necessary to reproduce here the thirteen instructions given at the request of the defendants. It is enough to say that the twelfth instruction withdrew from the jury the question of soundness of mind of the testator and left only the question of undue influence to be determined by the jury.

As the plaintiffs won below, and as they saved no exception to the giving of the twelfth instruction aforesaid and have not appealed from that ruling of the circuit court, the only question open for consideration in this court is as to the undue influence, and the decision will be limited to that question.

### I.

The term "undue influence" has in this State a settled meaning. It means such influence, "as amounts to over-persuasion, coercion, or force, destroying the free agency and will power of the testator. It must not be merely the influence of affection or attachment, nor the desire of gratifying the wishes of one beloved and trusted by the testator." [Jackson v. Hardin, 83 Mo. l. c. 185; Doherty v. Gilmore,

136 Mo. 414; McFadin v. Catron, 138 Mo. 1. c. 218; Berberet v. Berberet, 131 Mo. 410; Cash v. Lust, 142 Mo. 630; Riley v. Sherwood, 144 Mo. 366; Defoe v. Defoe, 144 Mo. 458; Aylward v. Briggs, 145 Mo. 604; Sehr v. Lindemann, 153 Mo. 276.] Such undue influence must not only exist, but it must be shown to have been actually exercised at the time the will was executed. [Brinkman v. Rueggesick, 71 Mo. 553.] And "affirmative proof of such undue influence is required to be made either by direct facts shown, or of facts and circumstances, from which undue influence results, as a reasonable and fair inference and not as a mere conjecture." [Doherty v. Gilmore, 136 Mo. 1. c. 420; Riley v. Sherwood, 144 Mo. 354; Sehr v. Lindemann, supra.] Ordinarily, "the burden is on the party asserting it to prove that a will is the result of undue influence." [Carl v. Gabel, 120 Mo. 283; McFadin v. Catron, 138 Mo. 197; Riley v. Sherwood, 144 Mo. 366; Berberet v. Berberet, 131 Mo. 1. c. 410; Doherty v. Gilmore, 136 Mo. 1. c. 419; Aylward v. Briggs, 145 Mo. 1. c. 613.] An exception to this general rule of law and common sense that a party making a charge must prove it, exists where it appears that a confidential relation is shown to have existed between the testator and the legatee, e. g. patient and physician, client and attorney, guardian and ward, communicant and priest, and where the will bequeaths substantially all the testator's property to the person standing in such confidential relation, to the practical exclusion of the natural objects of the testator's bounty. In such cases the law regards the transaction with suspicion and shifts the burden of proof to the devisees. [Mueller v. St. Louis Hospital, 73 Mo. 242; Hegney v. Head, 126 Mo. 1. c. 628; Bridwell v. Swank, 84 Mo. 455; Caspari v. The First German Church, 82 Mo. 649.]

Starting then with these established principles of law as the major premise, and the facts developed at the trial, as plaintiffs themselves state them, as the minor premise, the

sole question in this case is whether the court properly directed the jury and whether the jury drew the only conclusion which the facts proved warranted under the true law of the case, for of course if there was any substantial evidence upon which a verdict of undue influence can rest, the case was one for the jury; otherwise for the court. [Sehr v. Lindemann, *supra*, and cases cited.]

There is no pretense that there is any direct evidence in the case of undue influence exercised by Rev. Holke over the testator, at any time. It is insisted, however, that the facts and circumstances justify a reasonable and fair inference of the exercise of such undue influence. The facts and circumstances, which contestants rely upon as proving undue influence, are fully and artistically expressed and forcefully grouped in the fifth instruction given for the plaintiffs, and presented to the jury in this shape, without any of the explanatory or modifying or repellant testimony, facts or circumstances of the case, the court directed the jury that if they believed the facts and circumstances thus separated and commented upon to be true, as to which there was no conflict in the evidence, relating, as they do, principally, to the mere formal acts incident to the execution of the three wills, then "the law presumes that said Henry Tibbe disposed of his property in said last will by and through the undue influence of Rev. Holke, and the burden of proof is upon defendant to show that said Tibbe executed said will voluntarily and of his own free will, without persuasion or undue influence on the part of said Holke."

Analyzed, the facts stated in this instruction, which the court told the jury raised, in law, a presumption of undue influence of Rev. Holke over the testator, which operated to produce the will in contest are briefly these: 1st, the age, ignorance, religious feeling, disposition, early financial struggles and subsequent wealth of the testator, the natural objects of his bounty, and his membership in a church of which Rev.

Holke was pastor; 2d, the application of the testator to the pastor to write his first will, and the refusal of the pastor to do so, with its subsequent preparation by another minister, designated by the testator, of the same denomination, and its execution at the pastor's residence and in his presence, with a parochial teacher and a member of the same church, as witnesses; 3d, the wish of testator that the fact of the execution of the will be kept secret; 4th, the execution, at a later period, of a second will substantially the same as the first, drawn by the same person, at the same place, and in the presence of the same persons (except as to the subscribing witnesses) as the first will, with the same injunction of the testator as to secrecy; the transmission thereof to the treasurer of the Synode, and the destruction of the first will; 5th, the return by the treasurer to Holke of the second will, with a draft of the will in contest (without stating that the will was written in German and the draft changed to English by a reputable attorney of St. Charles at the testator's request) and the execution of the third will (the one in contest) at the same place, in the same presence (except that of the minister who wrote the first and second wills), the attestation by the same witnesses as the second will, with the same injunction by the testator as to secrecy; the return of the will, so changed from German to English, together with the second or German will, to the custody of the said treasurer where the third will was kept until after the testator's death, and the second will was kept until produced at the trial of this case in the court below.

Give to the facts, circumstances and conditions stated their fullest force and significance and they do not raise even a suspicion of undue influence, much less do they afford the basis for a reasonable and fair inference thereof. The fact that the testator asked Holke to write his will and when he stated the disposition he intended to make of his property, Holke refused to write it, stated, as it is in this blunt and unexplained manner in the instruction, is no element in a chain

of facts and circumstances constituting undue influence.   But even this refusal is urged as evidence of undue influence.   It is not even a suspicion thereof.   And when it is coupled, as the evidence shows it was, with Holke saying he wanted no trouble with testator's son, and advising the testator to be just to his own son and not to·do anything he would be sorry for later, it strips the case of every suspicion of unfairness, undue influence, coercion, force or over-persuasion on the part of Holke as to the testator.   The fact that the testator enjoined secrecy is no evidence of Holke's undue influence over him, nor is the fact that the second and third wills were placed in the custody of the treasurer of the synode, and it is well here to mention that this instruction while calling attention to the custody of the wills, omits to state the fact clearly proved by the uncontradicted testimony, that Holke advised that the will be placed in the custody of the judge of the probate court, at Union, Mo., but that the testator refused to do so, for fear its contents would become known.   Likewise it is well to note that while this instruction lays special stress upon the fact that the first and second wills were written by a minister of the same church as Rev. Holke, the uncontradicted testimony shows that Holke advised the testator to have his will drawn by the same attorneys who now represent the plaintiffs; a fact which was also omitted from this instruction.

In short, the fifth instruction was erroneous, first, because it singled out facts in the case and gave improper prominence and significance to them; and, second, because it declared that such a condition brought this case within the exception to the rule as to the burden of proof in cases of this character.   All the facts stated in this instruction did not prove that Holke exercised undue influence over the testator, nor did they show that a confidential or fiduciary relation existed between Holke and the testator.   Taken in connection with the other facts proved but not referred to in this instruction, the evidence wholly failed to establish a *prima*

*facie* case of undue influence or to bring the case within the exception to the rule as to the burden of proof. In view of this instruction the verdict of the jury is not surprising, for without this instruction there is no substantial foundation in the evidence upon which to rest the charge of undue influence, and instead of giving this instruction the court should have taken this issue, also, from the jury entirely and have directed a verdict for the defendants.

The fifth instruction is not cured by the third instruction given for the plaintiff nor by any of the instructions asked by and given for the defendants.

If there had been any substantial evidence in the case of any undue influence exercised by Rev. Holke over the testator, the third instruction given for the plaintiff would have been a proper instruction, and would have been as far as the court was warranted in instructing the jury on that subject at the instance of the plaintiffs. But its force and meaning was entirely overclouded by the fifth instruction. In a word, the court might as well have directed the jury to find the issue of undue influence for the plaintiffs as to give them the fifth instruction, for it was predicated upon facts which were conceded, but which were not all the facts nor the controlling or essential facts as to undue influence in the case, and it was therefore equivalent to a direction to find for the plaintiffs.

This will may not be what counsel, or the jury or the court would have made for the testator, if they had the power to dictate its terms. It is not the disposition which the law makes of a man's estate if he makes no will. But it is shown by the evidence and the accepted ruling of the lower court, in this case, that the testator was of sound and disposing mind, competent to make a will, which means that he knew what he was doing, what property he had and who the natural objects of his bounty were, and as was well said in Berberet v. Berberet, 131 Mo. l. c. 411: "A testator having sufficient mental capacity has the right 'to make an unreasonable, unjust,

injudicious will, and his neighbors have no right sitting on a jury, to alter the disposition of his property, simply because they may think the testator did not do justice to his family connection.' " And the same remark applies as well to a court.·

The lower court permitted almost unrestrained latitude to the inquiry, a much wider range than there is any precedent for in any reported case to which our attention has been called, but notwithstanding the life, affections, habits, trials, struggles, misfortunes and final unexpected acquisition of much wealth of the testator, from the cradle to the grave, have been fully aired and exposed in the case, the result fails to establish a proper case of undue influence to go to the jury, and the trial court should have directed a verdict for the defendants. All the facts, circumstances and suspicions have been fully and exhaustively brought out, and no good purpose would be subserved by putting the parties to the trouble and expense of another trial, therefore the judgment of the circuit court is reversed and the cause remanded to that court with directions to enter a judgment for the defendants, establishing the will in solemn form. All concur.

IN BANC.

MARSHALL, J.—The foregoing opinion heretofore delivered in Division No. 1, is hereby adopted as the opinion of the Court in Banc. *Burgess, Robinson* and *Brace, JJ.*, concur. *Valliant, J.*, dissents. *Gantt, C. J.*, and *Sherwood, J., dubitante.*

SEPARATE OPINION.

VALLIANT, J. (*Dissenting*).—The record shows that the testator was a native of Holland, who came to this country over thirty years ago a very poor man, a turner by trade, but who at the time of his death had accumulated a large fortune.

He left only his widow and one son to survive him. He was a man of simple industrious habits, and very religious. Between father and son there was always absolute confidence and affection. The son had been a faithful co-worker with his father in the building up of his fortune and by his industry, intelligence and more venturesome business courage had contributed very largely to his father's business success. He was the chief object of the old man's love and pride, who was often heard by his most intimate friends in his latter years, to say that when he was gone all the fortune would be his. He was a man of very little education, his native language was Dutch, and he had a very imperfect knowledge of either German or English. As before said, he was a very religious man, and a member of the German Lutheran Evangelical Church of the congregation of that church in Washington where he resided. The will in question was written in the parsonage of that church in Washington in the presence of the pastor by another preacher of the same church whom the pastor had nominated for that purpose, witnessed by two members of the congregation whom its pastor had selected and when executed was by the pastor sent to St. Charles to an official of the church and retained in the custody of one of the church officials until the death of the testator. By this will the testator leaves substantially one-half of his fortune to the church corporation, thus depriving this son, who was the sublime object of his father's pride and affection, of one-half of that which would have been his by inheritance. To that extent it was an unnatural will. The law will presume, until the contrary is shown, that a will of that kind made under those circumstances, was the result of undue influence, and the burden of overcoming that presumption and of showing that it was the free will of the testator, is upon those who produce the will from such a source and who are to profit by it. When the contestant showed the above facts he made out a *prima facie* case, and the burden of proof was upon the proponents. This

burden they undertook to carry and introduced evidence tending to show that no undue influence was used. It was for the jury to say whether or not that evidence was sufficient to overcome the contestant's *prima facie* case: the jury heard the evidence, weighed it, and pronounced verdict that it was not sufficient. It was a question peculiarly for the jury, who had the witnesses before them, and this court has no right to overthrow their verdict on that ground. The credibility of witnesses, the weight to be given to their evidence, belongs in the jury's province, and the court has no right to invade it. That is so of jury trials in general, and especially is it so in a will contest in which our statute says: "The verdict of the jury or the finding and judgment of the court shall be final, saving to the court the right of granting a new trial, as in other cases, and to either party an appeal, in matters of law, to the Supreme Court, or to the St. Louis and Kansas City Court of Appeals." [Sec. 8889, R. S. 1889.] In this case the utmost the trial court could have done, would have been to grant a new trial, if in its opinion the evidence of the proponents of the will sufficiently outweighed the *prima facie* case made by the contestant, but that court evidently did not think so, and therefore overruled the motion for a new trial. Now if this court is of the opinion that the verdict of the jury was wrong the utmost it should do would be to reverse the judgment and remand the cause for a new trial. It is wrong in my opinion for this court to reverse the judgment and remand the cause with directions to the circuit court to enter judgment establishing the will.

When the case was first decided in Division No. 1, I concurred in the majority opinion, but upon consideration of the motion for a rehearing and a closer study of the record, I have become satisfied that the result there reached was erroneous as a matter of law, and wrought in this case great injustice as a matter of fact. In my opinion the judgment of the cir-

cuit court was right and should be affirmed, but if the majority of this court think there is reversible error in the record the cause should be remanded for a new trial.