Riley v. Sherwood.

RILEY *et al.* v. SHERWOOD *et al.*, *Appellants.*

Division Two, May 31, 1898.

1. **Wills**: INCAPACITY OF TESTATOR. An aged person who understands the nature of the business in which she was engaged at the time she gave directions for the drawing of her will and at the time she executed it, and who at those times knew and remembered all her children and other descendants, and knew just what property she had and how she desired to dispose of it, in the absence of undue influence and fraud to induce her to make an unjust discrimination, was competent to make a will.

2. ————: ————: FEEBLENESS WITH AGE. A mere statement that as the testatrix advanced in years her mind was not so vigorous as in earlier life, imparts no information as to her want of capacity to make a will.

3. ———: ———: CHANGE IN AFFECTION FOR CHILDREN. Nor is it any evidence of incapacity that she had changed her affection for certain of her children who had not dealt fairly with her in a land trade; nor that, after a visit to the family of a son-in-law, who had formerly been offensive to her, she seemed to form a fondness for him.

4. ———: ———: RECOLLECTIONS OF VIRGINIA. Nor that she often recalled in her old age, with great fondness and frequent repetition, recollections of her childhood and young womanhood in Salem, Virginia, before the civil war.

5. ———: UNDUE INFLUENCE. The undue influence that will justify the setting aside of a will, must be such influence, exercised over the testatrix, prejudicing her against the heir discriminated against, as amounts to over-persuasion, coercion or force, destroying her free agency and will power. An instruction that told the jury that "such undue influence is not measured by *degree* or *extent*, but is sufficient to invalidate the will however *slight*," is exceedingly misleading and erroneous.

*Appeal from Audrain Circuit Court.*—HON. E. M. HUGHES, Judge.

REVERSED AND REMANDED.

*W. W. Fry* for appellants.

(1) There was not a word of evidence that any of the defendants exercised any influence over testator in procuring the will. *Berberet v. Berberet*, 131 Mo. 399; *Doherty v. Gilmore*, 136 Mo. 415; *Farmer v. Farmer*, 129 Mo. 538; *Carl v. Gabel*, 120 Mo. 283; *Norton v. Paxton*, 110 Mo. 461; *Jackson v. Hardin*, 83 Mo. 184. (2) There was no evidence showing testator's want of capacity to make the will, and the court should have so instructed the jury. The evidence at best was but that of fickleness and caprice, on account of which wills are not broken. *Jackson v. Hardin*, 83 Mo. 182; *Benoist v. Murrin*, 58 Mo. 307; *Brinkman v. Rueggesick*, 71 Mo. 553; *Myers v. Hanger*, 98 Mo. 439; *Harvey v. Sullens*, 46 Mo. 153; *Maddox v. Maddox*, 114 Mo. 42. (3) Evidence of how the testator's chil-

dren worked and assisted testator in making her property is not proper in a contested will case. *Couch v. Gentry*, 113 Mo. 248; *Maddox v. Maddox*, 114 Mo. 41. (4) The declaration of a testator before and after making a will is hearsay, except as it bears upon testator's intellect and affections at the time of the execution of the will. *Walton v. Kendrick*, 122 Mo. 518.

*George Robertson* for respondents.

(1) The court properly defined undue influence. Schouler on Wills, secs. 222, 225, 232; *Bogse v. Rossborough*, 6 H. L. Cas. 6; *Bridwell v. Swank*, 84 Mo. 455; *McClintock v. Curd*, 32 Mo. 411; *Carl v. Gabel*, 120 Mo. 283; *Norton v. Paxton*, 110 Mo. 456. (2) On the issue of mental capacity the evidence necessarily takes a very broad scope, and all the conduct and conversation of the testator, both before and after the will, in order to reach a conclusion as to the condition of testator's mind, is admissible, and under such issue evidence of other wills is admissible. *Thompson v. Ish*, 99 Mo. 160. (3) The evidence as to the relation of Mrs. Riley and Mrs. Showers to their mother, and the treatment of each of the mother, was not only proper under the rule, but was not objected to by defendants. (4) On the issues of unsound mind and undue influence the testimony must of necessity take a very wide range. Not only contemporaneous declarations, but both prior and subsequent, are admissible. Gillett, Indirect and Collateral Ev., sec. 281. (5) There was evidence of both undue influence and unsound mind, therefore the verdict can not be disturbed. *Garland v. Smith*, 127 Mo. 567.

GANTT, P. J.—Mrs. E. A. Shootman died in Mexico, Missouri, in February, 1895, at the age of

seventy-eight years. She left surviving her four daughters: Mrs. Georgiana Riley, Mrs. Mollie Showers, Mrs. Minnie Sherwood and Mrs. Fannie Tyrrell, and one son, Lucian E. Shootman. Her children were all married and had homes of their own. The old lady lived in some rooms over one of her business houses in the city of Mexico, and ordinarily stipulated for her board and necessary attention when leasing her other rooms to her tenants on the same floor. She had moved to Mexico with her husband and children from Fulton about the close of the war. We infer that her husband had little or no property at that time, and soon after their advent in Mexico, Mrs. Shootman began to earn her own living and provide for her family by engaging in the millinery business and dress-making. By her own efforts and the assistance of her children the property which forms the bone of contention in this case was accumulated with the exception of a legacy she received about 1873 or 1874 from Virginia, which is variously estimated from $800 to $1,900. At the date of her death Mrs. Shootman owned two brick business houses in Mexico of the value of $8,500, a vacant lot in said city and a small residence occupied by her son Lucian and three hundred and twenty acres of land in what was Garfield county, Kansas, estimated to be worth $200, and about $1,200 worth of personal estate. On the twenty-fourth of June, 1893, she executed her last will and testament, duly attested by William H. Kennan, Esq., and R. R. Arnold, cashier of the First National Bank of Mexico. The will was drawn by Mr. Kennan. By this will she devised the two store houses and the vacant lot to her two daughters, Mrs. Sherwood and Mrs. Tyrrell "to have and to hold as their sole and separate property free from the care and control of their husbands." To Lucian, her son, she gave the residence lot occupied by him for his life,

remainder at his death to his two youngest daughters, and $500. To Mrs. Riley she gave $500, and to Mrs. Showers $1, assigning as a reason why she did not give her more that she had theretofore "advanced to her goods and money to equal $6,000." This will was duly probated in the probate court. The present suit to have said will declared not the last will and testament of Mrs. Shootman was commenced by Mrs. Riley and Mrs. Showers and made returnable to the June term, 1895, of the Audrain circuit court A trial was had at the same term, and a verdict and judgment rendered that said paper writing was not the last will of Mrs. Shootman. From that judgment the defendants appeal. Other necessary facts will be stated in the course of the opinion.

I. The petition counts upon two grounds to set aside the will. *First*, that Mrs. Shootman was not of sound mind and memory; *second*, that the will was procured by undue influence of her daughters Mrs. Tyrrell and Mrs. Sherwood and their husbands, and particularly of C. C. Sherwood, the husband of Mrs. Sherwood.

The evidence on the part of the defendants was abundant to show that Mrs. Shootman had been a very energetic business woman and by her thrift, industry and economy had accumulated about $12,000 worth of property over and above the support of herself and children, and was fully competent to manage her affairs and dispose of the estate by her will. *Mr. Kennan*, the attorney who drew the document, testified he had known Mrs. Shootman for twenty-six years; had resided in Mexico, the city in which she lived, during all that time; that she was a fine business woman and of excellent mind, a determined and positive character, and careful in her business matters; had often done business for her. He detailed the circumstances

attending the draft of the will.    Mrs. Shootman sent for him to come to her rooms.    She had fallen and broken her thigh some fifteen years previous to this time, and could get up and down stairs only when assisted and then with much inconvenience to herself.    He went to see her.    She desired him to prepare her will.    He sat down, and took notes as she dictated, and then went to his office and drew the will, took it back, read it over to her, and after she expressed herself as satisfied with it, he went after Mr. Arnold, the cashier of the First National Bank, and they returned to her room. She signed it and then Mr. Arnold and Mr. Kennan attested it as witnesses.    Nobody else was present at the time.    She then took it and put it away.    She talked about all of her property and mentioned a piece of Kansas land that she said was mortgaged and was sandy and worthless and she said she would not put it in.    *Mr. Arnold* who was, evidently, entirely disinterested, testified that he had known Mrs. Shootman since 1872; that she did business with the bank of which he was cashier.    He says:    "I always thought she was a good, fair, average business woman.    She evidently had a good memory."    He recalled that she had assumed a mortgage on some Kansas property which she had purchased, and he had paid this interest for her and the taxes on that land through his bank.    In regard to that he says: "She would sometimes ask me if it was not about time that interest was due," and he could not remember without consulting his books, but would ask her when she sent the last draft, "and she could tell me exactly, and I would go to the bank and find I had sent the draft at that time." He continued his acquaintance with her up to a month or two of her death and long after the execution of the will, and he thought her mind was as clear and sound as it ever had been during his long acquaintance.

*B. L. Locke*, for many years county clerk of Audrain county, testified she was a bright sensible woman, methodical in her business and a good manager. *W. C. Gallaway*, a general salesman for the firm of D. B. Fisk & Company, of Chicago, testified he had sold Mrs. Shootman goods for twenty-five years. Saw her two or three times every year. After she went out of business, when he would go to Mexico he would go to see her, and spend the evening with her. He always considered her mental condition to be good, and it was as good in 1893 as it ever was. To the same effect is the evidence of a number of other witnesses for defendants, and we may add of those for plaintiffs, with this qualification, that *plaintiffs'* witnesses all or nearly all testified that in their opinion Mrs. Shootman was "childish," and when interrogated as to their definition of "childishness," they explained that she was very particular about her business. She required her tenants to incorporate in their checks in payment of rent to state for what month it was given; she was very solicitous that her own dishes and that other small articles should be replaced in her own room after they had been used in her tenants' rooms. On one occasion she was known to have cried because one of her tenants had left her without anything to eat in her house. It was said that she was given to repeating the same direction; to telling over and over the story of her past life, especially to recounting incidents of her life when a girl or young lady in Salem, Virginia; that she was a great talker, especially after she was confined to her rooms after she had suffered from a broken thigh. *Mrs. Riley*, one of the plaintiffs, a daughter who had married and left home before Mrs. Shootman and her other daughters had commenced and carried on the millinery business, testified her mother's natural disposition was pleasant, quiet, reserved and retiring;

that she disliked Mr. Sherwood; that he used vile language in the presence of her mother, and was disagreeable to her, and she had referred to him once as a fool, and up to her visit to this son-in-law in 1893 he had been repulsive to her, but after that visit he was very attentive to her. He would take hold of her, put his arms around her, and contrary to her former nature she was pleased with his attention. This witness testified that Mr. Sherwood was at Mrs. Shootman's on the day the will was made. She further testified her mother was very forgetful; lost her things about the house; would go to sleep in her chair, to which she was confined on account of her broken thigh and a very severe hurt to one of her feet; that she considered her mind very weak. While Mrs. Riley persisted in saying Mr. Sherwood's language was rude and vile, she could not be induced to state the expressions themselves, and she was wholly uncorroborated on this point. *Mrs. Showers*, the other plaintiff, testified that in the last years of her mother's life she could see a great difference in her. She had become much more feeble mentally. She was forgetful and childish, and was not able to attend to business. *Mrs. McKey*, a witness for plaintiffs, after saying Mrs. Shootman was childish, testified: "She was perfectly rational on all business subjects. I don't consider her so good on other subjects. She was perfectly clear on money matters. Her mind was good on money matters and business matters."

Plaintiffs called three physicians and propounded to them the following hypothetical question:

"*Q.* I will submit to you, Doctor, a hypothetical question: Suppose that a woman had been an active business woman and engaged, we will say, in the millinery business, and had been engaged in that from 1865, when she was a woman possibly forty-five years of age, and continued in that business, led an

active life, been what we would call a good business woman until 1890, or '91, or '92, somewhere along there, and along there we observe in her her business capacity was not so good; she had become forgetful of present events; was in the habit of repeating over and over the same story, and would frequently go back to her early life and tell it over and over again; would sometimes be in the act of telling something, and would suddenly forget and not be able to go on; there would be a transformation in her affections, and she would not have that feeling for some of her children that she had had before in her life, and that condition continued to intensify until 1893, and that same condition to exist in 1893; in the early part of her life she was rather dignified and reserved up to 1893, after this there seems to come a change upon her and things which had been disagreeable to her in early life would please her; she was a subject of flattery, of little attentions, such as giving her nicknacks and candies, such as doing her as a person would do a child. I will get you to state whether or not, in your opinion, in 1893 that person was of unsound mind or not?" Defendants objected for the reason that it is not based upon facts. In the first place some of the things stated are not in evidence; that is not the way to get at the question; immaterial and irrelevant. Plaintiffs' attorney here said, "If there is anything in that question not based upon the evidence, if defendants' attorney will point it out, I will change the question to conform to the facts." The court overruled the objection and defendant excepted. Two physicians answered that the facts supposed "all pointed to an unsound mind." The other testified it pointed to senility, and from a doctor's standpoint evidence of unsound mind, but it was very difficult to answer with reference to all the hypotheses, but when told he must

assume the truth of the facts, stated he would say "she was of unsound mind." Notwithstanding that Mrs. Showers thought her mother's mind was failing, she and her husband made a trade with her mother for some city property in Salina, Kansas, in the fall of 1891 by which she deeded them all her interest in the property for $500 for which they gave her their joint note. This property Mrs. Shootman had taken for the balance of millinery stock inventoried at $4,000. After a careful reading of every word of this evidence the conclusion is irresistible that there was no legal evidence worthy of the name which went to prove that Mrs. Shootman did not have sufficient intelligence to transact her ordinary business affairs and did not understand the nature of the business in which she was engaged when she had Mr. Kennan prepare her will and when she executed it. Nor can it be doubted that she knew and remembered all her children and grandchildren and knew exactly what property she had and how she wished to dispose of it. Having this much capacity in the absence of undue influence and fraud to induce her to make an unjust discrimination she was competent to make a will under the laws of this State. *Benoist v. Murrin*, 58 Mo. 322; *Jackson v. Hardin*, 83 Mo. 184; *Farmer v. Farmer*, 129 Mo. 530; *Berberet v. Berberet*, 131 Mo. 399; *Cash v. Lust*, 142 Mo. 630. It is incredible in view of all the evidence in this case that the jury should have believed that Mrs. Shootman's will should be set aside on the ground of a want of sufficient capacity to execute a will and we are forced to the conclusion that the circuit court only tolerated this verdict because it was of opinion that the jury was justified in finding against this will on the ground that there was sufficient evidence to justify them in finding it was procured by undue influence of the defendants or some one of them.

We are not unmindful of the sweeping expressions that the testatrix was "childish," and forgetful; that she was more feeble mentally than she had been in her more robust womanhood before she had suffered from her broken hip. In all this mass of testimony there is no evidence that she was incapable of transacting ordinary business, or was ignorant of her estate or the objects of her bounty. The mere statement that as she advanced in years her mind was not so vigorous as in her young womanhood imparts no information as to her want of capacity to dispose of her property. As was said in *McFadin v. Catron*, 138 Mo. 197, "Such indefinite generalities will not suffice." The law exacts something more definite and tangible than such assertions to overcome the judgment of the disinterested business men and neighbors who transacted business with this testatrix up to the time of her death without once questioning her ability to transact her business in an intelligent manner. "Opinion" evidence is very unsatisfactory at best, but when the facts upon which it is predicated disclose that it is without any reasonable foundation it has no probative force. Nor do we overlook the "expert" evidence. The medical profession sometimes complain that the courts do not keep pace with the scientific advance in the knowledge of insanity, and it may be they do not always, but certainly the courts are not unreasonable when they reject the conclusions of those who claim to be experts when they pronounce a person insane without hesitation upon such meagre hypothesis as that presented to them by the learned counsel for plaintiffs in this case. In this hypothesis it is deemed evidence of insanity that an old person does not remember recent events as vividly as those which transpired in her youth; that she had changed her opinion of a son-in-law after visiting him in his family, taking no account that her prior

opinion may have been based upon an unreasonable prejudice and her last opinion formed upon knowledge and experience that she had been prejudiced against him without any cause.

Again it was considered evidence of insanity that Mrs. Shootman in her old age delighted to recall the recollections of her childhood and young womanhood in Salem, Virginia. It was said the constant repetition of those events in her life was evidence of an unsound mind. To one who never lived in the "Old Dominion" prior to the late war between the States, the fondness with which all Virginians dwell upon those halcyon days, sweetened with an unrivaled hospitality, this tendency to recall again and again the memories of that period may seem unnatural, but to those who knew Virginia at that time even as casual sojourners, instead of being evidence of weakness, it would excite suspicion should a Virginian neglect for any considerable time to recount the glories and delights of that period. Indeed it can be said that such was the spell of that life that all who came within its influence became intoxicated with its charms and ever afterward dwelt with loving reiteration upon its refinement. We are unwilling to believe that any considerable number of the most advanced neurologists would see in this amiable disposition to linger over the memories of youth and home, the most remote evidence of unsoundness of mind. Certain it is that the courts of this land reject it as evidence of incapacity to make a will. We shall not adopt a rule which would practically debar nine tenths of the people who have passed the meridian of life of the privilege of disposing of their property by will. Neither is the fact that Mrs. Shootman did not have the same feeling for some of her children in her later days that she had when they were younger of itself and without qualification any evidence of

insanity.   The hypothesis ignores the ingratitude of children and many other reasons which might cause a change in a parent's feeling toward a child.   In this case Mrs. Shootman considered that Mrs. Showers and her husband had not dealt fairly by her in the Kansas land matters.

II.   We are thus brought to the consideration of the evidence offered to prove that the defendants procured the will to be made as it was, by undue influence exercised over Mrs. Shootman, prejudicing her mind against her daughter Mrs. Showers.   In this State the rule is established that such influence must be such as amounts to over-persuasion, coercion or force, destroying the free agency and will power of the testator.   It must not be merely the influence of affection or attachment nor the desire of gratifying the wishes of one beloved and trusted by the testator.   *Jackson v. Hardin*, 83 Mo. 185; *McFadin v. Catron*, 138 Mo. 197.   It is not sufficient that one may have influence over the testator but it must be shown that influence was unduly or unjustly exercised.   *Brinkman v. Rueggesick*, 71 Mo. 553.   Nor will the mere existence of a motive and an opportunity to exert undue influence suffice.   The burden is on the party asserting it to prove that a will is the result of undue influence.   *Carl v. Gabel*, 120 Mo. 283; *McFadin v. Catron*, 138 Mo. 197, and cases cited.

Now in this case there is not a scintilla of evidence that either Mrs. Tyrrell or Mrs. Sherwood exercised the slightest influence over their mother in procuring the will to be made as it was.   They were living with their families in St. Louis and Columbia and no witness testified to a word or act of theirs which could be tortured into an effort to dominate the mind of their mother or prejudice her against their sisters.   The charge of undue influence must rest entirely upon the

allegation that her son-in-law, C. C. Sherwood, exerted undue influence over Mrs. Shootman. The claim is made that prior to Mrs. Shootman's visit to Mrs. Sherwood's home in Omaha, he was disagreeable to Mrs. Shootman. But after that visit and after her return to Mexico, Mr. Sherwood, when in Mexico on his business as a commercial traveler, would sleep at Mrs. Shootman's and board with her tenant. He would procure ice, fruit and other delicacies and take them to the old lady and in his treatment of her was affectionate in speech and manner, and the old lady showed quite plainly her appreciation of his kindness. Both Mr. Kennan and Mr. Arnold testify unequivocally that Mr. Sherwood was not present either when the directions were given for the draft of the will or when it was signed by her and attested by them. It is true, a young granddaughter of the plaintiff, Mrs. Riley, testified that on some day in June, 1893, she came to see her great-grandmother, Mrs. Shootman, and when she reached the door of her room Mr. Kennan and Mr. Arnold were in the room with Mrs. Shootman, and had a number of papers out and one of them was writing, but she heard nothing about a will. During this occurrence Mr. Sherwood came in, and walked into the room and spoke to them, but she did not hear the subject of the conversation and left. Mrs. Shootman's tenant, *Mrs. Shaw*, testified that Mr. Sherwood was in Mexico and boarded with her. He paid her for his board. He was very nice and affectionate to Mrs. Shootman. She remembers he was there on the eighteenth and twenty-sixth days of June, but can not remember whether he was there on the twenty-third of June. This witness also testified that on one occasion Mr. Sherwood said to her that he had nursed Mrs. Shootman when she was sick, and she didn't want any one else to wait on her. He stated that the old lady was worth $50,000.

*Eva Blanchard* testified that she carried the note to Mr. Kennan when he was summoned to write the will. That day she saw Mr. Sherwood talking to Mrs. Shootman. In a word it was proven that this son-in-law when in Mexico on his business as a commercial traveler made his headquarters at his mother-in-law's house, but paid his board to her tenant; that he was kind and attentive to her and treated her affectionately; that he was probably in Mexico the day the will was written and because of this opportunity to influence her will, it is claimed this is evidence of undue influence. Upon evidence like the foregoing the court instructed the jury in the eighth instruction for plaintiffs as follows:

"No. 8. The court instructs the jury that the undue influence as used in these instructions is when the mind of the testatrix has been overpowered and subjected to the will of another, and if you shall believe from the evidence in the case that the said Mrs. Shootman at the time of the making of the will in question was weak minded, and some other person by artful and cunning contrivances or by flattery or by any pressure of whatever character overcame her own volition and caused her to make the will in question, then there was such an undue influence as will invalidate the will in dispute; *and you are further instructed that such undue influence is not measured by degree or extent, but that it is sufficient to invalidate the will however slight.*"

As already said the constraint, or fraud, or undue influence necessary to set aside a will must be a present restraint, fraud or undue influence operating upon the testator's mind so as to destroy his or her free agency and substitute for his or her own another person's will. To tell a jury that "such undue influence is not measured by *degree* or *extent* but is sufficient to invalidate the will however slight," is exceedingly misleading and erroneous. In the form given, a jury might

well conclude they were justified in setting aside a solemn will upon the slightest proof of the exertion of any influence over the testator or testatrix. While the facts of each case must determine whether undue influence has been exercised it can not be said that such influence is not measured by degree or extent. In "extent" at least it must amount to the substitution of the will of another for that of the testator. The last clause of this instruction in these words "and you are further instructed that such undue influence is not measured by degree or extent but that it, is sufficient to invalidate the will however slight" is without the sanction of the law, is not only hurtful and erroneous but contradicts the whole tenor of all the other instructions which required the influence to overpower the will of the testatrix.

The result reached by the jury can only be reconciled with the theory of this clause, and the court's action in sustaining it is evidently referable to this view of the law, because we think that there was no substantial evidence that the will was the result of undue influence by either Mr. or Mrs. Sherwood or Mrs. Tyrrell.

Upon the evidence we think the circuit court should have sustained a demurrer to the evidence, and refused the instruction number 8 given at the instance of defendant, and for these errors the judgment is reversed and the cause remanded with directions to the circuit court to proceed in accordance with the views herein expressed. SHERWOOD and BURGESS, JJ., concur.