# CROWSON et al. v. CROWSON et al., Appellants.

## Division Two, March 17, 1903.

1. . Will: CAPACITY OF TESTATOR: TESTS. The tests of the mental capacity of a testator are the facts which occurred at the time of the execution of the will, including its provisions, which if they show that he knew what property he owned, what disposition he desired to make of it and did make of it, all persons who came reasonably within the range of his bounty, and that he possessed sufficient understanding and intelligence to understand his ordinary business, indicate that he had sufficient capacity to make a will.

2. ———: ———: ———: CONTRACT: MANAGING ESTATE. One may be capable of making a will who is incapable of making a contract or managing his estates.

3. ———: ———: EVIDENCE: CASE STATED. Testator, a man sixty-nine years old, who had occasionally for five or six years suffered from sinking spells, at which times he had great trouble in breathing, being overtaken by a severe and prolonged attack of such spells and what seemed a hemorrhage sent for a doctor who first thought he had pneumonia but afterwards concluded it was grippe. The next day testator sent to the probate judge for a blank form of a will, and when it came with other suitable paper directed it to be put in a drawer, and on the following morning sent for a neighbor to come over and transact some business for him, but the returned word being that the neighbor was sick, he sent for another or his son to come over and write his will, but before they came, another friend called and he asked him to write the will, first asking his wife and other women present to leave the room. He dictated the will, giving all his property, real and personal, to his wife in trust for her support and the support and education of her children, and if she should marry she was to have only her dower interest, the rest to go to her children, giving to his three sons by a former marriage one dollar each, his reason for giving the property to his wife in trust he assigned at the time being that she was extravagant and if he left it all to her she might spend it. He signed the will as soon as it was written. Soon after he was "very nervous, restless, excited and talkative; if left for a few minutes he would sink into a kind of delirium and talk delirious;" his pulse was 130, respiration 42, temperature 99. Nevertheless, he continued to get up and down with assistance until his death two days later. *Held*, that there was nothing in either of these facts to indicate that he was not capable of making the will, and that the statements

Crowson v. Crowson.

of witnesses that he "was not at the time capable of transacting business matters," being mere opinions of non-experts, did not tend to show any incapacity.

4. ———: UNDUE INFLUENCE: BURDEN OF PROOF. The burden of proof is upon contestants to show undue influence, coercion, or over-persuasion, or fraud or deceit, in the procurement or shaping of the will, and that such influence, to invalidate the will, must have so dominated the will of the testator at the time of its execution that it was not in fact testator's will, but that of the beneficiary.

5. ———: ———: EXERCISE. Mere undue influence is not sufficient; to invalidate the will such influence must be so exercised as to result in the will made, and will not do so then if such influence was that of a wife or child and was exercised in a fair and reasonable manner, without fraud or deception.

6. ———: ———: STATEMENTS BY TESTATOR. Statements made by testator before and after the execution of the will are competent evidence as external manifestations of his mental condition, and of the state of his affections, but not as evidence of the truth of the facts stated.

7. ———: ———: CONDITION OF MIND. The evidence showed that testator was a man of strong will-power, that the will was made in pursuance of a plan conceived by him about the time his youngest child was born, two years prior to its execution, that he then said that he had provided for his children by a former marriage and clothed them until they were of age and that he expected to leave his property to his three children by his last marriage. *Held*, that all these facts and statements were competent as bearing on the question of the undue influence exercised upon him by the last wife.

8. ———: ———: INFLUENCE OF WIFE. If there is no evidence of any fraud or deception practiced on the testator by the wife, and the influence exercised was not, considering the state of testator's mind, of such a character as to destroy his free agency and make it her will and not his, it ought not to be set aside for undue influence of the wife, although there may be some little evidence tending to show that it was procured by the exercise of undue influence by her.

9. ———: ———: IMPUTATION OF FRAUD. The wife was not present when the will was made. It gave all testator's property to her in trust for her support and the support and education of his three minor children, aged two, five and eight years, respectively, with a provision that, if she married she was to have only her statutory dower and the rest was to go to these three minor children. It gave nothing to his three sons by a former marriage, all of whom

had arrived at their majority and for several years had had homes of their own and been doing profitable businesses for themselves and all of whom had received small sums from testator as they came of age. *Held,* that the will was not so unfair or unjust to these three older sons as to cast upon it an imputation of fraud and unfairness on the part of the wife in the procurement of the will made.

Appeal from Callaway Circuit Court.—*Hon. Jno. A. Hockaday,* Judge.

REVERSED.

*Robert McPheeters, J. W. Tincher* and *N. D. Thurmond* for appellants.

(1) The evidence in this case clearly shows that at the time testator made the will he understood the business about which he was engaged; knew the persons who were the natural objects of his bounty, and understood his relations to them, and knew what property he had, and the disposition he desired to make of it. The provisions of the will itself are such as any wise and prudent man would make for his wife and infant children, and the reasonableness of such provisions is proof itself of testamentary capacity. This being the case, the court should have taken the question of testamentary capacity from the jury. Cash v. Lust, 142 Mo. 630; McFadin v. Catron, 138 Mo. 197; Riggin v. Westminster College, 160 Mo. 570. (2) The law requires something more definite and tangible than mere indefinite generalities to destroy or overbalance the presumption of capacity. McFadin v. Catron, 138 Mo. 197; Doherty v. Gilmore, 136 Mo. 421. (3) The provisions of the will, without other testimony, establish both the sanity of the testator and his freedom from undue influence while directing and executing the same. The will itself is reasonable. Miller v. St. Louis Hospital, 5 Mo. App. 398. (4) The burden is on the plaintiff to show undue influence, coercion, overpersuasion, or fraud and deceit, in procuring the execution of a will.

Such influence, to invalidate a will, must dominate the will of the testator, so that it will not be his own act and deed. And this influence must have operated upon the mind of the person making the will at the time the same was made. In this case the wife was not present on Tuesday evening when he asked his nephew who was going to town next day to call on the probate judge and get him a blank will, nor when his nephew handed him the papers late Wednesday evening, nor was she present at the time the will was written and signed, but was sent from the room by her husband and by the writer, Mr. Beaven, for fear that even her presence would invalidate it. McFadin v. Catron, 120 Mo. 275; Sunderland v. Hood, 84 Mo. 293; Tibbe v. Kamp, 154 Mo. 545. (5) The testimony of Mrs. Mary Gustine shows that it was the intention of the testator to leave his property by will to these younger children. The will is in accordance with the declarations made to her at the time the birth of his youngest child was announced to him. This is strong corroborative proof of testamentary capacity and also of freedom from undue influence. Thompson v. Ish, 99 Mo. 160. (6) The court admitted the testimony of Tom Miller as to statements made by deceased prior to the making of the will, which testimony was admissible for the purpose of showing the state of testator's mind, his previous purposes and intentions, and therefore, it was admitted without objection on the part of defendants, but it was not admissible for the purpose of showing undue influence of the wife over her husband. And yet it can be readily seen that it would have just this effect on the minds of the jury unless the court instructed the jury that they could not consider it for this purpose. The court gave no such instruction at the close of the testimony. This we contend was reversible error. Even if this testimony proved the existence of an influence of the wife, attempted to be exerted, yet it is not sufficient to invalidate the will, because there is no evidence that he yielded to her entreaties, nor that such an influence was exerted upon him at the time the will was

made, which was ten days after the alleged statements. Thompson v. Ish, supra; Sunderland v. Hood, 84 Mo. 293.

*D. P. Bailey* and *D. H. Harris* for respondents.

(1) The expert evidence is all to the effect that it was not probable, though possible, that deceased was in condition, mentally, to make the will in question. The jury found that he was not and the trial court refused to interfere with the verdict. (2) Appellants, under second point, use this language: "When the formal execution of a will according to the requirements of the statutes is shown, as in this case was done, a will prima facie valid is established, and it then rests upon the contestants to overcome this presumption by substantial evidence." Citing McFadin v. Catron, 138 Mo. 197. This language omits the following words: "Beyond a peradventure and the subscribing witnesses testify to the proper age and sanity of the testator." In this case Beaven, one of the subscribing witnesses and who wrote the will, testifies that testator was not of sound mind. (3) Appellants' third point is that the provisions of the will establish both the sanity of the testator and his freedom from undue influence. They claim that "the will is reasonable," etc. Is this true? Deceased married a Miss Todd in 1860. She had a great deal more than he did. She was a good worker and manager and a good financier and made more of the living than he did. She was anxious to have a home of their own and all they could make they put in their home and bought out the shares of the heirs as fast as they could (i. e., the heirs of deceased's father). His first wife died in 1877, leaving three boys, the contestants, and a little girl, who died at fourteen months of age. After his wife died, deceased and the three boys lived on and worked the farm until the boys became of age. (4) Is the will reasonable? The widow and minor children are entitled under the statutes to a homestead amounting to $1,500. She got dower in per-

sonalty about $500. Her children, the minors, will get one-half the balance of the real estate, estimated at $2,500, making in all some $3,900 or more, besides the property set over to her as individual and which she got from him. This leaves to the three contestants about $1,250—not much, but if the judgment of the trial court is upheld, these three boys will be relieved of the stigma of being disinherited by a father, whom they—with their mother—helped to make a small competency, for an ordinary farmer. The will is unreasonable, unconscionable and unjust. Hence, the probative force of the instrument itself is wholly lost.

BURGESS, J.—This is a statutory contest of the will of R. T. Crowson, deceased, late of Callaway county, The will bears date March 2, 1899, and the testator died on March 6, 1899, at the age of sixty-nine years. The will was admitted to probate by the probate court of Callaway county on March 9, 1899. The petition alleges, first, that at the time R. T. Crowson executed said will he was not possessed of sufficient mental capacity to make a valid will; and, second, that said pretended will was procured by undue influence of Minnie Crowson, his wife, over the said R. T. Crowson.

The answers were general denials. The answers of all the defendants, except that of Minnie, were of their guardian *ad litem*, they being minors.

The issues were duly framed by the trial court and submitted to a jury resulting in a verdict that the paper in evidence was not the will of R. T. Crowson. Defendants appeal.

The facts briefly stated are that R. T. Crowson was married twice, his first wife leaving at her death three sons, Eugene L., Jonathan (called "Doc.") and Egbert. At the time of the death of their mother they were all minors, living with their father on his farm, where they remained until about the time they became respectively of age, or nearly so. The two younger ones, Doc and Egbert, worked their father's farm a year or two after they became of age and received a part of the

crops for their services. In November, 1889, six or eight years after the death of his first wife, R. T. Crowson married the defendant Minnie, whose name before her marriage was Liggon, and took her to his home. The two younger boys were still with their father and remained with him for a year or more after his marriage to his second wife. These sons as they became of age received small sums from their father, as much as his circumstances permitted him to give them, and also received from their grandmother's estate money or property amounting to seven or eight hundred dollars. R. T. Crowson died leaving the three sons by his first wife, and three small children by his last wife, to-wit, Edmund, eight years old, Mary five, and Ruth two. At the time of his death his older sons were all established in business—the oldest, Eugene, was a practicing physician doing a good practice near St. Joseph, Missouri, Doc was on a farm near Fulton, and the youngest, Egbert, owned a farm of seventeen acres set out in young fruit trees, about four miles from St. Joseph.

For eight or ten years before his death R. T. Crowson was troubled with smothering spells, supposed to be caused by heart trouble. These spells became more frequent the last year or two before his death. He had not been able to perform any heavy manual labor for a number of years. Any violent exertion or any unusual occurrence would bring on the smothering spells, so that he would have to be fanned and have the doors and windows opened so as to get as much air as possible. During the winter prior to his death his health was worse than it had been; however, he continued to look after his stock, fed them and sheltered them himself until about a week before his death. He was troubled a good deal with his breathing on the eighteenth of February, and also on the twenty-fifth, and on up to the twenty-eighth, but most of that time he continued to look after and feed his stock, except on one or two days when his son, Doc, or a neighbor did that work for him. On Monday, February 27th, he was worse and seemed to have what his wife thought was

a hemorrhage of the lungs, and she sent for the doctor, who came to see him for the first time Monday night about bedtime.   The doctor thought from his first symptoms that he was attacked with pneumonia, but afterwards concluded he did not have pneumonia, but that he died from the effects of an attack of the grip and general prostration from age.   On Tuesday he asked his nephew who was going to Fulton Wednesday to ask the probate judge to send him a form of will.   His nephew saw the probate judge and asked him for a blank will for his Uncle Dick.   The probate judge had no blank forms for wills, but wrote out from a book the beginning and the attesting clause of a will, and sent that with two extra sheets of the same kind of paper, the last being requested by William Crowson, the nephew, so that in case he spoiled one he could use the other.   These papers were delivered to him Wednesday evening late and he directed his nephew to put them in a certain drawer, which he did.   On Thursday morning he directed his brother-in-law, Burnham Liggon, about how to feed and look after his stock, and also requested him to go over to his neighbor's, John A. Griffith's, and ask him to come over; that he wanted him to attend to some business for him.   Liggon returned and informed him that Mr. Griffith was sick and could not come.   He then asked Liggon to go over to another neighbor, Charles Whaley, and ask him to come over and write a will for him, and that if he could not come to ask his son, Curtis Whaley, to come.   Both of these last two gentlemen came as soon as they could, but when they got there he was having his will written by John Beaven, who happened to call that morning. There were several present when the will was written.   He expressed pleasure at Mr. Beaven's having come and told him that he wanted him to write a will.   Before, however, he would give any directions about writing the will—the provisions of the will—he requested his wife to set a table out for Mr. Beaven, and requested Mrs. John A. Griffith to open a certain drawer

and get the papers—the same papers he had sent his nephew for, the form of will that Judge Beaven had sent him.   He also requested his wife, or Mrs. Griffith, to get the pen and ink.   After this he requested his wife and Mrs. Griffith to leave the room, which they did, and did not return for some time afterwards, when Mrs. Crowson and Mrs. Griffith were requested to leave the room by Mr. Beaven.   Mrs. Crowson was not in the room at any time while he was giving any directions about his will.   He directed the will to be written disposing of his property as therein provided, and spoke about his purposes in so doing, that his little children would have to be educated and the older sons were provided for and that his wife was extravagant and did not know the use of money, and that if he left his property all to her absolutely, she might spend it and leave nothing for the children, and for that reason, in case of his wife's re-marriage she should only have her dower, and the rest he wanted to go to the children.   While Mr. Beaven was writing the will his older sons—all three of them—came, and wanted to go in the room where their father was, but his wife put them off, as they say, by telling them that he was having a sinking spell and it might kill him for them all to go in at that time.   In about fifteen minutes after the sons came, Mr. Beaven had completed the will and the sons were admitted to the room.   He died on Saturday morning, following, continuing to get up and down with assistance to the time of his death.

The will is very short and free from ambiguity. It disposes of all of the testator's property in one clause which reads as follows:

"First, I will and bequeath to my wife all my real and personal property—after paying all my just debts —to be held in trust by her during her widowhood or lifetime for her support and the support and education of her children.   If she marries again she is to have her lawful dower and the remainder is to be divided between my younger children, Edmond, Mary and Ruth,

except one dollar each to my older children, Eugene L., Jonathan and Egbert. I hereby appoint my wife as executrix to carry out this will.''

On the question of mental capacity there is some conflict in the evidence of the ''opinions'' expressed by the witnesses. Defendant contends that there was no evidence to support the verdict on mental incapacity to make the will.

While counsel for the contestees admit that on the question of mental capacity of the testator there is some conflict in the evidence of the ''opinions'' expressed by the witnesses, they contend that there was *no evidence* to support the verdict on mental capacity sufficient to make the will.

Upon this feature of the case John T. Beaven who wrote the will, signed it as an attesting witness and certified to it as such that at the time of its execution the testator was of sound mind and disposing memory, testified upon the trial as follows: ''I didn't think he was of sound mind'' at the time he made the will. ''He was very sick; suffering, breathing very hard and very rapid, and was very nervous and excited and didn't seem to realize the difference between personal property and real estate. I didn't consider that he was at himself properly. He was not composed at all in mind.''

This witness having attested the execution of the will was competent to give his opinion as to the condition of the testator's mind at that time, but he gave no satisfactory reason for the change of his mind with respect to the condition of the testator's mind at the time he certified that he was of ''sound mind and disposing memory,'' and at the trial, when he testified that he did not think he was of sound mind at the time he made the will. But the facts which occurred at the time of the execution of the will, including the provisions of the will, show to the contrary, and that the testator not only knew what property he owned, what disposition he desired to make of it, all the persons who came reasonably within the range of his bounty, but that he

possessed sufficient understanding and intelligence to understand his ordinary business, and what disposition he was making of his property. These are the tests of mental capacity to make a will. [Harvey v. Sullens, 56 Mo. 372; Benoist v. Murrin, 58 Mo. 307; Norton v. Paxton, 110 Mo. 456; Couch v. Gentry, 113 Mo. 248; Kischman v. Scott, 166 Mo. 214.]

Other witnesses, offered by plaintiffs upon this feature of the case were as follows:

Dr. E. L. Crowson, a son, who saw deceased a few minutes after the will was written, says: "Father was very restless, nervous, excited and talkative. When we would rouse him up he would ask questions and answer questions—I should say semi-intelligently. If left for a few moments, he would sink into a kind of delirium and talk kind of delirious. Pulse, 130; respiration, 42; temperature, 99. I don't think he was in a condition from the time I got there to transact ordinary business. I would say that any person in the condition in which I found him was not capable of transacting business matters."

Dr. Gibbs, the attending physician, says that on Monday, deceased had had a hemorrhage; that he got there that night at ten o'clock and stayed until eight o'clock next morning. "His respiration was excited, also his circulation, and he was excited—scared. Pulse 110; no fever. Thursday night, I got there just about twelve o'clock. He had weakened considerably. Temperature, 98; pulse, 112; respiration, 52—normal being 18 to 24."

Jonathan Crowson testifies that he was not in condition to transact business, that on Wednesday before the will was made "he was just as bad as he could be."

Egbert Crowson says: "When I saw him [Thursday the day the will was made] I thought he was dying."

John Guy, who stayed with deceased the night of March 2, says: "He was in bed. He didn't talk much. Sometimes he would talk flighty."

James T. Crowson, a nephew, stayed there Tuesday night and until eleven o'clock Wednesday. "His mind was kind of off, I think, all the time. Talked right smart. During Tuesday night he took two kinds of medicines alternately and whiskey. I think he was growing a little worse all the time. I wouldn't think he was capable of transacting business in the shape he was in while I was there."

Thomas F. Crowson says: "Was at his house the day the will was written. Found him a pretty sick man. He seemed to be very nervous and was picking at the bed clothes. I wouldn't say that his mental capacity at that time to attend to ordinary business was very good."

The only statements of these witnesses which have any bearing whatever upon this feature of the case are to the effect that the testator "was not at the time of executing the will capable of transacting business matters." These statements were mere opinions of non-experts without a single fact upon which to predicate them. There was no attempt by the testator to transact any business at that time other than to make his will, and his directions with respect thereto to Mr. Beaven who wrote it showed that he had a clear perception of what he was doing, and what disposition he was making of his property. The expert testimony did not help the contestant's case. Besides, a man may be capable of making a will and yet be incapable of making a contract or managing his estate. [Brinkman v. Rueggesick, 71 Mo. 556; Jackson v. Harding, 83 Mo. 175; Maddox v. Maddox, 114 Mo. 35; Crossan v. Crossan. 169 Mo. 631.]

We agree with counsel for the contestees that the burden was upon the contestants to show undue influence, coercion, or overpersuasion, or fraud and deceit, in the procurement of the execution of the will, and that such influence, to invalidate the will, must have so dominated the will of the testator at the time of its execution that the will was not in fact his own will, but that of his wife, Minnie Crowson. [McFadin v. Catron,

120 Mo. 252; Sunderland v. Hood, 84 Mo. 293; Tibbe v. Kamp, 154 Mo. 545.]   It is not the existence of undue influence, but the exercise of it in the execution of the will which invalidates it.   There was some evidence adduced, but very little, by the contestants tending to show that the will was procured by the exercise of undue influence over the mind of her husband by Mrs. Crowson; on the other hand there was evidence that he was a man of strong will power, as well as substantial evidence tending to show that the will was made in pursuance of a plan conceived by him about the time his youngest child was born.   His statements made before and after the execution of the will were competent evidence as external manifestation of his mental condition, and of the state of his affections, and not as evidence of the truth of the facts stated.   [Rule v. Maupin, 84 Mo. 587; Thompson v. Ish, 99 Mo. 160.]   The evidence showed that about the time his last child was born the testator said that he had provided for the other children and clothed them until they were of age, and that he expected to leave to these three little children his property.

It is said in Thompson v. Ish, 99 Mo. 160, that "the influence of a wife or child upon a testator, while the later has power to deliberate and estimate the inducements, will not avoid the will, if the influence is exerted in a fair and reasonable manner, and without fraud or deception.   The influence of one occupying such relation to the testator, to avoid the will, must be such as to overreach and destroy the free agency and will power of the testator."   There is no evidence of fraud or deception practiced upon the testator; and in view of the fact that there is no such evidence, the will ought not to be set aside for undue influence of the wife, in the absence of evidence showing that, considering the state of the mind of the testator, the influence was not of such a character as to destroy the free agency of the testator, and make it her will and not his.   [Myers v. Hauger, 98 Mo. 433; Campbell v. Carlisle, 162 Mo. 634.]

Nor do we think the will so unfair and unjust to contestants as to cast any imputation of fraud or unfairness on the part of Mrs. Crowson in the procurement of its execution. She was not present when the will was executed, and simply holds the land in trust during her widowhood or lifetime for her support, and the support and education of her children. If she marries again she is to have her lawful dower, and the remainder to be divided between her children. The contestants have all arrived at their majority, and have had for several years homes of their own, and been doing profitable business for themselves. The three contestees were at the time of their father's death aged, respectively, eight, five, and two years, and nothing could seem more natural than that he should have an earnest solicitude for their welfare and with that object in view he should give all that he possessed to their mother in trust for them.

Our conclusion is that there is no substantial evidence to support the verdict. We therefore reverse the judgment without remanding the cause.

All of this Division concur.