JOHN BORCHERS, JR., Administrator, etc., Respondent, v. HENRY M. BARCKERS, Appellant.

St. Louis Court of Appeals, November 2, 1909.

1. **LIFE INSURANCE: Assignment of Policy: Testamentary Act.** The assignment by a father of his interest in his life insurance policy to his son only a few days, at most, before his death, is akin to a testamentary act, and the rules regarding mental capacity and undue influence applicable to a 'testator ought to be applied in such case.

2. **————: ————: Mental Capacity of Assignor: Question for Jury.** Evidence *held* to present a question for the jury as to the mental capacity of insured at the time of assigning his interest in a life insurance policy to one of his sons.

3. **EQUITY: Suit for Fund Deposited With Bailee by Mutual Consent.** Where there are two claimants for a fund, which, by mutual consent, is deposited with a bailee to await the determination by the court as to who is the owner, a suit by one of such claimants against the other and the bailee, to determine the title to such fund, appears to be in the nature of a suit in equity.

4. **LIFE INSURANCE: Assignment of Policy: Mental Capacity of Assignor: Definition.** Mental capacity of insured to make an assignment of life insurance means intelligence sufficient to understand the act he is about to perform, the property he possesses, what disposition he is making of it, and the persons and objects of his bounty.

5. **————: ————: Undue Influence: No Proof.** Evidence *held* not to prove undue influence as to an assignment by insured of his interest in a life insurance policy to one of his sons.

6. **————: ————: Gifts: Wayward Child.** A parent has a right to give property to a wayward child; and neither his other heirs nor a jury are entitled to select the object of his bounty, and set aside a gift because they think it undeserved.

7. **————: ————: Undue Influence: Evidence.** The exertion of influence and its effect in inducing a will or contract may be shown by circumstances, and need not be directly proved, but there must be some evidence, circumstantial or direct, tending to prove these facts, and not merely engendering a suspicion of their existence or showing opportunity for the exercise of improper influence, without showing that it actually was exercised.

8. ———: ———: ———: **Weakness of Mind: Evidence.**
Weakness of a person's mind does not, *ipso facto*, prove he was
unduly influenced.

9. ———: ———: ———: **Must be Exerted: Evidence.** In
order to set aside an assignment of his life insurance policy from
father to son on the ground the latter exerted undue influence
over the mind of the former, there must be circumstances proved
which point to the successful employment of undue influence,
or positive testimony to that effect.

10. ———: ———: ———: **Trial Practice: Burden of Proof.**
In an action by an administrator against a son of decedent to
determine the ownership of the proceeds of a policy of life in-
surance paid upon the death of decedent, where the answer
alleged title in the son, under and by virtue of an assignment
of said policy, made by insured to him, and the reply, among
other things, averred the assignment, if made, was procured by
undue influence on the part of defendant, the burden of proof
was on plaintiff to establish the assignment was thus procured.

Appeal from St. Louis City Circuit Court.—*Hon.
James E. Withrow,* Judge.

REVERSED AND REMANDED.

*H. A. Loevy* for appellant.

(1) Appellant's instruction No. 3 which was in
the nature of a demurrer to the evidence should have
been given, because (1) there was no substantial evi-
dence of any undue influence, and (2) there was no sub-
stantial evidence of want of mental capacity. (a)
There was no substantial evidence of "undue influence"
as defined by Gay v. Gillilan, 92 Mo. 261; Studebaker
v. Cofield, 159 Mo. 614; McKissock v. Groom, 148 Mo.
467; Jones v. Roberts, 37 Mo. App. 180; Richardson
v. Smart, 65 Mo. App. 20; Crowson v. Crowson, 172
Mo. 703; 29 Am. and Eng. Ency. Law, 103; Ib., 105
and 111. The law on this point is admirably summed
up recently in Teckenbrock case, 209 Mo. 533. (b)
There was no substantial evidence of "want of mental
capacity" as defined by Chadwell v. Read, 198 Mo. 379;

McKissock v. Groom, 148 Mo. 468; Hamon v. Hamon, 180 Mo. 701; Sayre v. Trustees, 192 Mo. 128; Knapp v. Trust Co., 199 Mo. 663; Crowson v. Crowson, 172 Mo. 702; Weston v. Harrison, 212 Mo. 266; Kieschman v. Scott, 166 Mo. 227; 14 Am. and Eng. Ency. Law, p. 1010. (2) Respondent's instructions Nos. 1 and 2 are erroneous because they enlarge the issues: The petition pleads only undue influence by appellant, whereas the instructions embrace such influence by "any other person for them or either of them." (3) Appellant's instruction No. 1 should have been given as it submitted his theory of the case correctly. (4) Appellant's instruction No. 2 should have been given. Porter v. Boyd, 112 S. W. 238. (5) The court erred in admitting the testimony of the three distributees of the estate of the decedent, nominally for respondent administrator, but practically in their own behalf. Bevis case, 106 Mo. App. 435; Bieber v. Boekman, 70 Mo. App. 506; Meier v. Thieman, 90 Mo. 444; Messimer v. McCray, 113 Mo. 389; Swift v. Martin, 19 Mo. App. 488; Nichols v. Jones, 32 Mo. App. 657; 30 Am. and Eng. Ency. Law, p. 922.

*Collins & Chappel,* for respondent, filed argument.

John Borchers died January 11, 1905, leaving as his children and heirs John Borchers, Jr., Ernest Borchers, Henry N. or "Nick" Barckers, defendant, and his two married daughters, Sivia Strotjost and Katherine Hobusch. Defendant has changed the spelling of his name to Barckers. He is commonly called "Nick" by his relatives and acquaintances. A policy of insurance in the Mutual Reserve Association was issued to John Borchers, Sr., on his life, July 10, 1900. After he fell sick, to-wit, January 4, 1905, he assigned his interest in the policy to his son Nick Barckers, dying, as said, a week later and intestate. His son John was appointed administrator of the es-

tate and both he and Nick claimed the proceeds of the policy, John as administrator and Nick as assignee. By agreement of the rival claimants the liability of the company was settled for $600, this sum was paid to a trust company to be held until the disposition of it was determined by suit, and John Borchers, administrator, filed the petition in the present suit setting out the issuance of the policy, the death of his father intestate, his appointment as administrator, the settlement of the liability of the company for $600, that defendant claimed to be assignee of the policy by an assignment and transfer made on January 4, 1905, while plaintiff claimed it as administrator of the estate, denied the right of Nick Barckers under the assignment, and prayed that the trust company be ordered to pay the fund to plaintiff. Henry Barckers answered, admitting the formal averments of the petition regarding the issuance of the policy, etc., then alleged the deceased had, on January 4, 1905, executed and delivered to defendant the following documents:

"Application for change of beneficiary.

"Mutual Reserve Life Insurance Company.

"I herewith return to you my policy No. 387,500, issued July 10, 1900, for $2000, and direct that the beneficiary as therein stated be changed, and the policy now be made payable to Henry N. Barckers, 42, Son, St. Louis. State cause why change of beneficiary is desired: Love and affection for the proposed beneficiary.

"Dated St. Louis, this 4th day of January, 1905.
                                        his
                "(Signed) JOHN X BORCHERS."
                                        mark
"State of Missouri, City of St. Louis, ss.

"On this 4th day of January, in the year one thousand nine hundred and five, before me, the subscriber, personally came John Borchers, to me known,

and known to me to be the person mentioned and described in and who executed the foregoing instrument, and acknowledged to me that he executed the same.

"My term expires September 10, 1906.

"(Signed)        H. A. LOEVY,

(Seal)                "Notary Public."

"Consent of Existing Beneficiary.

"(Should the beneficiary as at present stated in the policy be an adult, the following clause must be signed by such beneficiary, before sending this to the Home Office. If beneficiary be a minor, so state.) I herewith consent to the above-mentioned change of beneficiary.

his

"(Signed) JOHN X BORCHERS."

mark

The answer further averred that by virtue of said assignment or change of beneficiary, he was entitled to the proceeds of the policy and plaintiff had no right or title of any kind or nature. The trust company, which was made a party to the suit, filed an answer admitting it held the fund to be paid to the party found to be entitled by the decree. In reply plaintiff denied John Borchers, deceased, on January 4, 1905, made, executed or delivered to defendant the assignment or change of beneficiary set out in the answer, and denied further that by virtue of said assignment or change of beneficiary, or in any other manner, defendant was entitled to the proceeds of the policy. Further averred that by the terms of the policy, no valid assignment could be made unless the association consented to it and the association had not consented to the one in question. Further averred that at the time deceased signed his name to the assignment or change of beneficiary, if in fact he ever did, he was "not of legal capacity to sign such document and therefore the said pretended assignment or change of beneficiary is not the act or deed of the said John Borchers, deceased."

Further averred that if the deceased signed said pretended assignment or change of beneficiary, he did so through the undue and improper influence of said Henry M. Barckers and without consideration; wherefore the pretended assignment or change of beneficiary, if signed by said deceased, was not his act or deed.

After the evidence had been heard and instructions passed upon, the cause was submitted to a jury which returned a verdict in favor of plaintiff, and judgment having been entered accordingly, this appeal was prosecuted. The court left the case to the jury on the ground plaintiff was entitled to recover if the execution of the assignment was induced by undue influence exercised over the mind of the deceased Henry Borchers by his son Nick, or any other person for him. The instructions for plaintiff in substance told the jury as follows: Though they might believe from the evidence at the time of the execution of the so-called assignment of the policy deceased was of sound mind and memory and of sufficient mental capacity to execute said assignment, yet if they further found and believed from the evidence that at the time of the execution of said writing the mind of deceased was, from disease, age, decrepitude, bodily or mental attack, or other cause or causes, subject to the dominion and control of defendant, and that defendant or any person for him, unduly exercised such dominion, power or influence over the mind and will of deceased when he executed said assignment so as to destroy his free will and knowledge in the disposition of his property, so that such disposition was not his free will and desire, then the verdict should be for plaintiff. A second instruction for plaintiff defined the words "undue influence" as used in the instructions to mean any influence which restrained, controlled, directed, diverted or coerced the will or overcame the mind and judgment, and directed the jury to give a verdict for plaintiff if they believed from the evidence Henry N. Barckers, or any other person or per-

sons in his behalf, by persuasion or other device or machination, controlled, directed, restrained or coerced the will, or confused the mind of John Borchers, deceased, or confused or overcame his power of judgment of the true relation between himself and those who were the natural objects of his bounty, in the execution of the paper or writing read in evidence as and for his assignment of said policy, so that said instrument does not express the will and desire of said assignor in the disposition of his property. The jury were further told to take into consideration the mental and physical condition of deceased at the time of executing the instrument, all the circumstances attending the execution, the instrument itself and its provisions, in determining whether undue influence was used to procure its execution. The court held consent of the company was not material to the controversy between the parties to this suit, refused to declare the signature to an instrument made by the mark of a person, instead of writing his full name, was as valid in law as if the person had written his name, and refused further to instruct there was no evidence to prove deceased was not of legal capacity to sign the assignment at the time he signed, or that he did so through the undue or improper influence of defendant.

It is necessary to state the substance of the testimony. It will be observed the assignment or direction for change of beneficiary purports to have been acknowledged before H. A. Loevy, notary public, on January 4, 1905. Mr. Loevy testified that the morning of said day, defendant had called at his office and asked him to come out during the day to take the acknowledgment. He went, taking his notarial seal, met defendant at a transfer point on the street railway, accompanied him to the place where deceased was, found the latter sick in bed and his physician, Dr. Martin, there. He (Loevy) took the policy, wrote out the assignment or application to change the beneficiary, the

deceased got out of bed, walked to a table in the room and made his mark in two places. The table was not very far from the bed. After doing this deceased handed the policy to his son Nick. The deceased seemed to be ill with a cold and was coughing; said his son Nick had been kind to him and he wanted to leave the policy to said son. It should be stated deceased and defendant at that time were living in a two-story barn a short distance from where John Borchers lived. They had been living in the barn for about a year and two other sons, or at least one other, had lived there also. Deceased took his meals at his son John's and defendant prepared his own meals at the barn. Deceased was a dairyman and until about two weeks before he died, had attended to his dairy business, caring for milk, delivering it and the like. Mrs. Strotjost gave a great deal of testimony, most of which was immaterial, relating to the character of defendant and tending to prove, as plaintiff's counsel said, he was a "black sheep," of idle habits, had gotten into trouble with his wife, or wives, and had called on his father to pay money for him. She said another son of deceased had died a month or so before and her father was deeply affected by this loss and never was the same afterwards; that after he took to his bed he was a very sick man, had a swollen neck, expectorated a great deal and was weak; was back and forth in bed for two weeks; was only "right down in bed" about a week; there was no trouble between the father and any of the other children except Nick. Her father while sick had very little to say; would talk about his own affairs; sometimes would come over to her house with his horse and buggy and spend hours talking with her husband for advice, and also with her brother John, the plaintiff. We suppose those conversations were prior to his last illness. She said deceased was in the habit of telling about his business but did not tell about having made the assignment. She was asked whether he was in

such condition as to know what he was doing—whether he was of sufficient mental capacity to understand the paper or assignment, and answered: "No, father would know nothing about such a thing as that in the condition he was in." Mrs. Hobusch gave similar testimony regarding the illness of her father; said he was weak mentally and physically; at times could comprehend his acts and at other times not; he could write his name and she had repeatedly seen him sign it; said her father had lived in the house of his son John awhile but wanted to go back to the barn to be with Nick. John Borchers also gave much testimony tending to disparage defendant's character. He testified that in his opinion deceased was not fit to do any business, "sign things over one to another." As to the time in which he was in this condition, the witness limited it to "a short time before he died." Dr. Martin, who waited on deceased, gave testimony the latter was pretty sick for four or five days before he died; a week before he was in a fair condition mentally and only got in such shape he could not do anything on the last day of his life; became unconscious on that day and was unconscious until he died. The testimony of this witness had a slight tendency to prove the assignment was taken on the day deceased died, though the witness declined to fix the day positively but said he never saw Mr. Loevy there but once; he was with the deceased every day during the last ten days of his life; the week before he died he was in a fair condition and able to transact business; had asthma and this developed into pneumonia. Isaiah Mandlestam testified that about a week before deceased died witness had seen him milking cows and delivering milk; working in the stable; deceased had talked to witness about trouble with his children; said two boys, Herman and Ernest, were nearly always drunk; deceased talked to him about insurance; said the two boys could run the dairy if they behaved themselves; if they did not he would give the

cows away; said he would give the oldest one a couple of thousand dollars. This was four or five weeks before he died. O. E. La Roage testified, among other things, Nick, defendant, attended to the dairy, worked around there and handled the milk; in October or November, 1904, the old gentleman was talking about his insurance and said he intended to give the insurance up; none of the family seemed to interest themselves in it; Nick who was present said he would keep it up; whereupon the old gentleman said he (deceased) would have nothing more to do with it. Joseph Wellmeyer stated that in April, 1903, deceased had applied to him for some money to pay the premium on the insurance policy, and had then said as long as he (deceased) had no wife he would leave the insurance to his son Nick. Deceased owned four and one-half acres of land near or in St. Louis on the Natural Bridge Road, and other property that descended to his children equally.

GOODE, J. (after stating the facts).—The assignment of the insurance policy to defendant is attacked in plaintiff's petition on three grounds, lack of consent of the insurance company, want of mental capacity in the deceased to execute any document at the time this one was executed, and procurement of the assignment through undue influence exercised over the mind of the deceased by defendant. Only the last of the three grounds was submitted to the jury in the instructions, as one on which, if the evidence supported it, they might return a verdict in favor of plaintiff. It will be perceived the main instruction for plaintiff did not leave it to the jury to say whether deceased was of sufficient mental capacity to execute the assignment, but taking for granted he was, directed the jury to find whether defendant, or any one for him, possessed and wielded an undue influence over deceased and thereby

143 App—6

brought about the assignment without its being the individual act of deceased. There is some evidence in this record, though slight, from which an inference of want of mental capacity in the deceased to execute the assignment might be deduced. The act was akin to a testamentary one, and the rules regarding mental capacity and undue influence applicable to the case of a testator ought to be applied here. The two daughters and the son gave testimony tending to prove their father lacked mental capacity during his illness to know what he was doing, though when scrutinized, this testimony is not cogent. Then there is the fact of the mark instead of the signature of deceased being affixed to the policy, and Dr. Martin's testimony which tended to prove the assignment was on the day deceased died and when he had lapsed into a semi-conscious condition. The doctor's statement was so uncertain on this point as to be of little weight; but is perhaps a circumstance on the issue of mental capacity. All the evidence on this issue sufficed to send the case to the jury, as it was tried by a jury, though it appears to be in the nature of a suit in equity. What would constitute capacity to make the assignment will be understood from declarations of the Supreme Court, that legal competency to transact business, or rather to make a will, means intelligence sufficient to understand the act the testator is about to perform, the property he possesses, what disposition he is making of it, and the persons and objects of his bounty. [Sehr v. Lindemann, 153 Mo. 286, 288; Riley v. Sherwood, 144 Mo. 354, 363.]

We find no proof of the exercise of undue influence over the mind of deceased by defendant or some person for him, in order to induce the assignment of the policy to defendant. The members of the court have perused the evidence several times and consider it a blank as regards proof of this charge. The only other person than defendant who could have been meant

as the one who might have influenced deceased unduly, is Mr. Loevy, an attorney, but who acted in this matter as notary public, and simply took the acknowledgment of deceased. For aught shown he did literally nothing else. The only circumstance to prove any conversation had passed at any time between defendant, Nick Barckers, and his father during the latter's last illness, about a transfer of the policy to defendant, is that the latter requested Mr. Loevy to go where deceased lay sick and take an acknowledgment of the assignment. If credible witnesses are to be believed, deceased had expressed an intention before he fell ill to transfer this policy to defendant. A great deal is said about defendant's being a "black sheep" and we think this charge was dwelt on at the trial more than it deserved. As said, there was some proof defendant of late years had been idle and maybe troublesome to his father; but there is other evidence to prove he helped carry on the dairy business and that the father was attached to him. A parent has the right to give property to a wayward child; and neither his other heirs nor a jury are entitled to select the object of his bounty and set aside a gift merely because they think it was not deserved. The questions for the triers of the fact were the mental competency or incompetency of the deceased, and whether the act was his own or he was overcome, coerced or over-persuaded so as to make it the result of the influence of another over him, exercised to a degree that dominated his will. A reading of the cases wherein transactions were assailed as having been induced by undue influence, will show the Supreme Court of Missouri has taken a strong ground regarding the right of a person to dispose of his property by contract or will, and against the policy of setting transfers and wills aside on slight proof that they were brought about by such an influence. The weight of authority supports said court in its positions, which we venture to remark are wisely taken; for it is common for per-

sons who are disappointed in their expectations of patrimony, to attempt to cast suspicion on bona fide transactions. For one thing, there is a dearth of evidence in the present record to show defendant had any special influence, due or undue, over the mind of deceased. The tendency of the evidence for plaintiff was to prove deceased was out of patience with defendant and unlikely to listen to him. For influence to be exerted it must, of course, exist. But it must not only exist, but there must be proof that it was exerted, and effectively. [Brinkman v. Rueggesick, 71 Mo. 553; Riley v. Sherwood, 144 Mo. 354, 366; Crowson v. Crowson, 172 Mo. 691, 703.] The exertion of it and its effect in inducing a will or contract, may be shown by circumstances and need not be directly proved. But there must be some kind of evidence, either circumstantial or direct, tending to prove those facts, and not merely to engender a suspicion of their existence, or show opportunity for the exercise of improper influence without showing it actually was exercised. [Tegenbrock v. McLaughlin, 209 Mo. 533, 551; Doherty v. Gilmore, 136 Mo. 414, 419.] We are not unmindful of the fact in this connection of there being evidence which would tend to show a weakened mental condition in deceased which, though not amounting to legal incapacity to transact business, would render him the more susceptible to improper influences. But his weakness of mind, if such there was, does not, *ipso facto,* prove he was unduly influenced. If it did, many wills which are perfectly valid, would be set aside, for having been executed when the testators were languishing in their last illnesses. What we hold is there must be circumstances proved which point to the successful employment of undue influence or positive testimony to that effect, and there was neither in the present case. [Riley v. Sherwood, 144 Mo. 354, 366; Sehr v. Lindemann, 153 Mo. 276, 289.] We hold, too, the burden was on plaintiff to establish the assignment was thus procured, as it is in

most cases where undue influence in bringing about a transaction is alleged. [Tibbe v. Kamp, 154 Mo. 545, 580.] If deceased was of sufficient mental capacity to participate in a transaction, then tested by the principles declared in the foregoing decisions of the Supreme Court, and other decisions of the same court referred to in the cases cited, the present record is barren of evidence to prove the assignment of the policy of insurance to defendant was other than the voluntary, spontaneous and unsolicited act of the deceased, prompted by paternal affection for defendant and a desire to make some provision for him. Similar doctrines to those set forth have been declared by the Supreme Court in cases involving dispositions of property by transfers *inter vivos*. [McKissock v. Groom, 148 Mo. 459; Chadwell v. Reed, 198 Mo. 351.]

The judgment is reversed and the cause remanded. *Nortoni, J.,* concurs; *Reynolds, P. J.,* concurs in reversing the judgment but not in remanding the cause.